1  Baruch C. Cohen, Esq. (SBN 159455)
**LAW OFFICE OF BARUCH C. COHEN**
2      A Professional Law Corporation
4929 Wilshire Boulevard, Suite 940
3  Los Angeles, California 90010
(323) 937-4501       Fax (888) 316-6107
4  e-mail: baruchcohen@baruchcohenesq.com

5  *Attorney For Defendant Nicholas Silao*

6

7              UNITED STATES BANKRUPTCY COURT

8              CENTRAL DISTRICT OF CALIFORNIA

9                   RIVERSIDE DIVISION

10

11  In re                                Case No. 6:17-bk-19336-SY

12  PANDORA HOSPICE CARE, INC.           Adv. 6:18-ap-01193-SY

13      Debtor                           Before the Honorable Scott H. Yun

14  _____          Chapter 7

    KARL T. ANDERSON, CHAPTER 7
15  TRUSTEE                              **DEFENDANT'S OBJECTION TO THE
                                         REASONABLENESS OF PLAINTIFF'S
16          Plaintiff                    ATTORNEY FEES; DECLARATION OF
                                         BARUCH C. COHEN AND NICHOLAS SILAO**
17  vs.

18  NICHOLAS SILAO                       Date: 11-18-2021
                                         Time: 10:30am
19          Defendant                    Courtroom 302
                                         Place: 3420 Twelfth Street, Riverside

20          This dispute arises from Defendant Nicholas Silao (hereinafter, "Defendant")'s motion to

21  allow withdrawal of deemed admissions.

22          After several attempts, on 9-9-2021, the Defendant was ultimately able to successfully have

23  the deemed admissions withdrawn (in part). However, the Court conditioned its ruling subject to

24  Defendant and his former counsel Sanaz Bereliani jointly and severally liable in compensating the

25  trustee and the bankruptcy estate for the attorneys' fees and costs incurred by the trustee and trustee's

26  counsel in this discovery dispute. The Court added that if Ms. Bereliani actually files a declaration

27  under penalty of perjury saying it is her fault, and that Defendant bears no responsibility, the Court

28

10/11-11:57am

1   might reconsider the apportionment. Rather than they're both jointly and severally liable for the

2   attorney fees, that it might be reapportioned either more to Ms. Bereliani or completely Ms. Bereliani.

3         At the 9-9-2021 hearing, the Court set a schedule for the trustee to submit his fees incurred

4   in this discovery dispute, and for the Defendant and Ms. Bereliani to object: (1) 9-24-2021 - The

5   Trustee's Brief on his fees is due; (2) 10-15-2021 - Oppositions by you and Mr. Silao is due on the

6   Trustee's Fees; & (3) 11-18-2021 at 10:30am - Telephonic Hearing on the  Trustee's Fees.

7         On 9-23-2021, the Trustee filed the *Declaration of Thomas J. Polis Re: Polis & Associates'*

8   *Fees* [Doc-93] requesting $18,905.00 in fees.

9         Defendant objects to the Trustee's fees on several grounds: First, on a holistic level, a fee of

10   this magnitude is per se unreasonable given the paucity and simplicity of the issues presented in the

11   motion. Second, a granular analysis of the billing statements suggests that the Trustee acted with an

12   unnecessary and unreasonable degree of aggressiveness, perhaps in reliance on a mistaken belief that

13   this Defendant would "roll over" and not contest its legal fees. Third, it is without question that Ms.

14   Bereliani is completely at fault here, she should be completely responsible for the Trustee's fees.

15   Fourth, the Court assumed certain facts about the Defendant that are simply not accurate.

16

17   DATED:     October 11, 2021     LAW OFFICE OF BARUCH C. COHEN, APLC

18                         By    /S/ Baruch C. Cohen
                              Baruch C. Cohen, Esq.

19                         *Attorney For Defendant Nicholas Silao*

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

         A FEE OF $18,905.00 IS OBJECTIVELY UNREASONABLE GIVEN THE

              NATURE AND SCOPE OF ISSUES PRESENTED BY THE MOTION

              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

         THE BILLING STATEMENT DEMONSTRATES THAT THE PLAINTIFF

              OPPOSED THE DEFENDANT'S MOTION WITH AN UNNECESSARY

              AND UNREASONABLE DEGREE OF AGGRESSIVENESS OUTSIDE

              THE SCOPE OF THIS DISCOVERY MOTION . . . . . . . . . . . . . . . . . . -1-

         EFFORTS TO OBTAIN MS BERELIANI'S DECLARATION OF FAULT WERE

              IN VAIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

         THE COURT ERRONEOUSLY ASSUMED CERTAIN FACTS ABOUT THE

              DEFENDANT THAT ARE SIMPLY NOT ACCURATE . . . . . . . . . . . -8-

   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

1.    **MEMORANDUM OF POINTS & AUTHORITIES**

    a.    **ARGUMENT**

        i.    **A FEE OF $18,905.00 IS OBJECTIVELY UNREASONABLE GIVEN THE NATURE AND SCOPE OF ISSUES PRESENTED BY THE MOTION**

The Trustee seeks $18,905.00 for simple a one-issue discovery motion. That issue was whether the Defendant's failure to respond to the Plaintiff's Request for Admissions was due to Ms. Bereliani's failures.

Given the paucity of issues presented by the motion, given the clear evidence that Ms. Bereliani was at fault and the Defendant's diligence in trying to correct the problem, the Plaintiff persistence in trying to force a default on the Defendant was unreasonable. The Plaintiff should not be rewarded (and the Defendant should not penalized) for the zealousness with which the Plaintiff elected to oppose the Defendant's motion.

Based on the foregoing, the request for fees and costs should be deemed "unreasonable" and denied.

        ii.    **THE BILLING STATEMENT DEMONSTRATES THAT THE PLAINTIFF OPPOSED THE DEFENDANT'S MOTION WITH AN UNNECESSARY AND UNREASONABLE DEGREE OF AGGRESSIVENESS OUTSIDE THE SCOPE OF THIS DISCOVERY MOTION**

The Plaintiff's 7-20-2019 ($142.50), the 8-8-2019 ($570.00), the 8-12-2019 ($285.00), the 9-10-2019 ($142.50), the 12-16-2019 ($332.50), the 12-20-2019 ($95.00), the 1-9-2020 ($95.00), 1-10-2020 ($332.50), the 1-13-2020 ($285.00), 1-27-2020 ($95.00), totaling $2,375.00 in charges for the pre-trial stipulation and conference do not relate to this discovery dispute. The $2,375.00 should not be passed on to the Defendant. This "fee" should be disallowed.

The Plaintiff's clerical time for scheduling the motion is not compensable and the Defendant objects as they do not relate to this discovery dispute. The continuation of the hearing on the

-1-

Defendant's motion were not the result of Defendant but due to the Court's availability (partially due to Covid). The specific charges are the Plaintiffs': 9-10-2019 ($142.50), 1-27-2020 ($95.00), 6-15-2020 ($142,50), 6-22-2020 ($95.00), 6-24-2020 ($95.00), 6-25-2020 ($190.00), 6-26-2020 ($95.00), 7-6-2020 ($95.00), 9-8-2020 ($95.00), 10-22-2020 ($190.00), 2-23-2021 ($142.50) totaling $1,377.50 should not be passed on to the Defendant. This "fee" should be disallowed.

The Plaintiff's time for settling the motion is not compensable and the Defendant objects as they do not relate to this discovery dispute. The specific charges are the Plaintiffs': 1-22-2020 ($285.00), 1-23-2020 ($142.50), 2-26-2020 ($427.50), 9-7-2021 ($142.50), totaling $997.50 should not be passed on to the Defendant. This "fee" should be disallowed.

In total, these $4,750.00 charges are objected to and should not be awarded to Plaintiff. Regardless of the method of analysis which the Court elects to apply, there is little doubt that Plaintiff is seeking to recover attorney fees which are more than reasonable for this narrow discovery dispute. Alternatively, on the face of it, a fee in excess of $18,905.00 is excessive for what was accomplished. This entire matter could have been avoided and much ink could have been spared had the Plaintiff simply allowed Defendant's verified Response to Admissions and not stood on ceremony to force an unfair default on Defendant. The Court should review the Plaintiff's 2-26-2020 billing entry showing that the Trustee sought to strong-arm and extort $50,000.00 from the Defendant to settle this discovery dispute - when the Trustee's billing was only $18,905.00. The unseasonableness of the Trustee's position became increasingly obvious with the passage of time as the Court made clear its displeasure of Ms. Bereliani's mishandling of the matter.

The Defendant does not dispute that the Plaintiff is entitled to aggressively pursue its rights, but when that same Plaintiff seeks to shift the burden of that effort, the Court must step in to subjectively assess the reasonableness of the claim. The Plaintiff has overstepped and should bear the expense of its strategic decisions.

      iii.    **EFFORTS TO OBTAIN MS. BERELIANI'S DECLARATION OF FAULT WERE IN VAIN**

On at least two hearings, this Court has found that Ms. Bereliani is at fault and the Defendant

1  maintains that she should be responsible for the Trustee's fees in this dispute.

2      As this Court said at the last pretrial hearing on 1-17-2020,

3      THE COURT: And, you know, I'm obviously not going to request, Mr. Cohen, that
you pay this, because you inherited this mess. ***But the person who is really at fault***

4      ***here is the Defendant's former counsel***. And I've got to tell you. This -- the reason
why I'm saying, when we come back here we're going to try to resolve that dispute,

5      I really want to see that person in this courtroom face to face. On paper, I don't believe
her. ***On paper, I think she just did a horrible job. She abandoned the client when the***

6      ***client said, I want to hire a  new attorney. I just don't believe her based on the story***
***I've seen on paper. That's why I want to see her in this courtroom***. [Emphasis

7      added].

8  [Transcript, p.7, lines 16-25, p.8, lines 1-3].

9      MR. COHEN: To what extent do you, your Honor, need my client present? My client
lives in New York.

10

11     THE COURT: Yeah. I do not. I don't really need him here. I think -- unless there's
something I haven't seen yet.

12     MR. COHEN: His declaration says he didn't receive anything from --

13     THE COURT: Right.

14     MR. COHEN: -- Bereliani's office.

15     THE COURT: Right. That part I find credible. I think this all comes down to Ms.
Bereliani, and whether I believe her. ***And, ultimately, even if she falls on the sword***

16     ***and says it's all her fault, okay, there's going to be a consequence for her, in order***
***to help her former client get over this hurdle***. I am a true believer that if you give

17     litigants, attorneys, parties, my children, anybody a free pass, a mulligan, they never
learn any lesson. My kids know this. There's always a penance, a consequence, a cost

18     for daddy's forgiveness. ***A price has to be paid***. Then they learn. It never happens
again. ***If I give Ms. Bereliani, even if she comes, she cries, she falls on the sword,***

19     ***it's all her fault, it's not the client's fault, there's going to be a price for that, so that***
***she learns to never do that again***. So, good luck to both of you, and one way or

20     another we're going to move forward with this adversary proceeding. [Emphasis

21     added].

22  [Transcript, p. 20, lines 24-25, p.21, lines 1-25, p. 22, lines 1-25, p.23, lines 1-13].

23     At the 9-9-2021 hearing, this Court stated:

24     THE COURT: ***Ultimately, Ms. Bereliani should have done more. She should have***
***at a very minimum sent the request for admissions and other discovery requests to***

25     ***you, Mr. Cohen*** [Emphasis added].

26  [Transcript, p. 11, lines 9-11].

27     THE COURT: ***And Ms. Bereliani is at fault for allowing that to happen***.

28

1    [Transcript, p. 12, lines 8-9].

2

         THE COURT: ***To me, if there is a problem between Mr. Silao and Ms. Bereliani, Mr. Silao should just sue her for malpractice. If he has to pay for all of this, he should just sue her for malpractice. That dispute as between Mr. Silao and Ms. Bereliani, that's between them. They should resolve it, not here, somewhere else.*** [Emphasis added].

3

4

5    [Transcript, p. 19, lines 6-11].[1]

6        After the 9-9-2021 hearing, on 9-10-2021, Defendant's counsel wrote to Ms. Bereliani

7 informing her of the Court's ruling.[2]

8        In response, on 9-10-2021, the defiant Ms. Bereliani responded:

9

      Mr. Cohen, I am happy to provide a declaration to the court of what I was to testify yesterday. To say that you have thrown me under the bus for no reason to save your client is not something I expected of a Rabbi, who is supposed to be ethical. That is an understatement.

10

11

12

      The fact that I did not show yesterday was simply due to the emergency I was going through and lack of ability to communicate sooner. I was not at disneyland or CAALA like some other people. My mother has dementia alzheimers, when she has a fall and caregivers go missing and I am the one in charge of everything while living in a hotel because my hot water pipe burst and flooded my home, I think it is human for something in my position to lose track of time and day because I'm dealing with my mothers well being. My fault yesterday was not being able to communicate with the Court that I had an emergency and needed a continuance. If you were to follow my track record as an attorney and officer of the court you'll see I've NEVER been sanctioned and I am a very respected attorney.

13

14

15

16

17

      I appreciate you emailing me the status from yesterday, however, I do not see a reason to take blame for something I am not responsible for three years ago. Please remind your client that he fell silent and disappeared and evaded the court and his then attorney - me.

18

19

20

      Very interesting that all these things are happening between Rosh and Kippur and my first bad experience in bankrupty court is with a Rabbi, definitely did not see that coming.

21

      I will be responsive to the Court accordingly.[3]

22

23

---

24       [1]A true and correct copy of the 9-9-2021 Transcript is attached hereto as Exhibit "1" and is incorporated herein by this reference.

25

26       [2]A true and correct copy of Mr. Cohen's 9-10-2021 letter to Ms. Bereliani is attached hereto as Exhibit "2" and is incorporated herein by this reference.

27       [3]A true and correct copy of Ms. Bereliani's 9-10-2021 letter to Mr. Cohen is attached hereto as Exhibit "3" and is incorporated herein by this reference.

28

In response, on 9-11-2021, Mr. Cohen wrote Ms. Bereliani:

Dear Ms. Bereliani: You might want to seriously reconsider your position - not to take full responsibility for Mr. Silao's failure to respond to the Plaintiff's RFAs - once you read the Court's transcript of the hearing.

Judge Yun commented that while you have general bankruptcy cases before him, you have virtually no adversary cases before him, and actually recommended - from the bench - that Mr. Silao consider suing you for malpractice. Perhaps a State Bar complaint will be filed, but that has yet to be determined.

Contrary to your 10-15-2018 retainer agreement you did not notify Mr. Silao of "each step of the process" as you did not even notify Mr. Silao of the Plaintiff's RFA's which were served on you on 3-7-2019.

In your 10-31-2018 Answer to the Trustee's Complaint you asserted a 2nd Affirmative Defense that "*Plaintiff has Insufficient Evidence To Establish Their Case.*" On what basis did you assert that Plaintiff has insufficient evidence to establish his case? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In your 10-31-2018 Answer to the Trustee's Complaint you asserted a 4th Affirmative Defense that "*even if the Plaintiff had a legitimate claim against the Defendant, that claim is excepted from turnover to the extent that such debt may be offset under 11 U.S.C. § 553.*" On what did you base your assertion that even if the Plaintiff had a legitimate claim against Mr. Silao, that claim is excepted from turnover to the extent that such debt may be offset under 11 USC 553? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

On 1-2-2019, notwithstanding your limited scope of retention to *only* file an Answer, you subsequently participated in filing a Joint Status Report (pursuant to LBR 7016-1(a)(1) as the one attorney responsible for trying the case or the attorney who is responsible for preparing the case for trial), wherein you responded to Question # B3 (Readiness for Trial), that you expect to complete Mr. Silao's discovery by May 2019. On 1-17-2019, you had Michael Smith your special appearance attorney cover for you at the Status Conference where the Court set the discovery cutoff date by 6-28-2019. Therefore, Judge Yun stated that you certainly knew that discovery would be propounded.

Further evidence that you knew that discovery would be propounded is:

In the 1-2-2019, Joint Status Report you responded to Question # B2 (Readiness for Trial), that Mr. Silao's reason for being ready for trial in July 2019 was because he intended to propound discovery and attend mediation. On what did you base your assertion that Mr. Silao intended to propound discovery and attend mediation? Did you discuss this with Mr. Silao in writing? Did Mr. Silao authorize you to pursue mediation? did you have MR. SILAO execute pursuant to California Evidence Code §1129 *Mediation Disclosure Notification and Acknowledgment?* What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # B3 (Readiness for Trial), that Mr. Silao expects to complete his discovery by May 2019. On what did you base your assertion that Mr. Silao would expect to complete his discovery by May 2019? Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # B1 (Readiness for Trial), that Mr. Silao would be ready for trial in July 2019? On what did you base your assertion that Mr. Silao would be ready for trial in July 2019? Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # C1 (Trial Time), that Mr. Silao's estimate of trial would be 1 court day. On what did you base your assertion that Mr. Silao would need 1 court day for trial? Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # D (Pre-Trial Conference), that Mr. Silao requested a pretrial conference after 5-31-2019. Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # E (Settlement), that Mr. Silao requested that this case be mediated. Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # F (Final Judgment Order), that Mr. Silao consented to this Court's jurisdiction. Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

On 2-6-2019, you wrote Mr. Silao that you were no longer retained to represent him further after you filed the Answer for him, and that if he did not substitute you out immediately, you will be forced to withdraw, and on 2-11-2019, you sent him a Substitution of Attorney. I believe I recall Judge Yun speculating that you probably waited and scrambled to move to withdraw on 3-15-2019, 1-week after you received Plaintiff's RFAs to avoid having to respond to them.

And then on 8-7-2019, you sent me only 12 documents and specifically, you did not send me the Trustee's RFAs that were served on you on 3-7-2019, in violation of the California Rule of Professional Responsibility 4-100(B).

And then, to add to your confusion, on 9-17-2019, you sent me your declaration in support of the Motion. ¶¶ 4-6 claiming that after your representation ended when you filed your answer, in 1-2019, you were then "retained for the purpose of filing a Joint Status Report and an appearance at the Joint Status Conference." The problem with your claim, is that there is no evidence in your file, that you were formally retained to handle the Joint Status Report and the Status Conference.

The record is pretty clear, that the fault for this debacle lies solely with you in not providing Mr. Silao with the Trustee's RFAs that caused him not to respond and default.

As the Court said at the last pretrial hearing on 1-17-2020,

> THE COURT: And, you know, I'm obviously not going to request, Mr. Cohen, that you pay this, because you inherited this mess. But the

1   person who is really at fault here is the Defendant's former counsel.
    And I've got to tell you. This -- the reason why I'm saying, when we
2   come back here we're going to try to resolve that dispute, I really want
    to see that person in this courtroom face to face. On paper, I don't
3   believe her. On paper, I think she just did a horrible job. She
    abandoned the client when the client said, I want to hire a  new
4   attorney. I just don't believe her based on the story I've seen on paper.
    That's why I want to see her in this courtroom.

5
    [Transcript, p.7, lines 16-25, p.8, lines 1-3].
6
7   MR. COHEN: To what extent do you, your Honor, need my client
    present? My client lives in New York.

8   THE COURT: Yeah. I do not. I don't really need him here. I think --
    unless there's something I haven't seen yet.
9
10  MR. COHEN: His declaration says he didn't receive anything from --

11  THE COURT: Right.

12  MR. COHEN: -- Bereliani's office.

13  THE COURT: Right. That part I find credible. I think this all comes
    down to Ms. Bereliani, and whether I believe her. *And, ultimately,
14  even if she falls on the sword and says it's all her fault, okay, there's
    going to be a consequence for her, in order to help her former client
15  get over this hurdle*. I am a true believer that if you give litigants,
    attorneys, parties, my children, anybody a free pass, a mulligan, they
16  never learn any lesson. My kids know this. There's always a penance,
    a consequence, a cost for daddy's forgiveness. *A price has to be paid*.
17  Then they learn. It never happens again. *If I give Ms. Bereliani, even
    if she comes, she cries, she falls on the sword, it's all her fault, it's
18  not the client's fault, there's going to be a price for that, so that she
    learns to never do that again*. So, good luck to both of you, and one
19  way or another we're going to move forward with this adversary
    proceeding. [Emphasis added].

20  [Transcript, p. 20, lines 24-25, p.21, lines 1-25, p. 22, lines 1-25, p.23, lines 1-13].

21  The Motion was not about "throwing you under the bus" and has absolutely nothing
    to do with my being an ethical person or rabbi, or whether Judge Yun's comments at
22  the hearing occurred between Rosh Hashana and Yom Kippur. I wrote you my earlier
    letter to give you an opportunity to prevent Mr. Silao from having to pay the Trustee's
23  $22,000.00, and purposely did not copy Plaintiff's counsel Tom Polis, so that you
    could save face. You, however, copied Mr. Polis with your response which was of
24  your own doing and unfortunate.

25  In no way am I insensitive to your mother's plight. On the contrary, I am extremely
    sensitive to her plight and to yours as her caregiver, as my mother died tragically from
26  dementia alzheimers, so I am acutely aware of the pain. Judge Yun stated on the
    record that he was informed by his clerk of your unavailability, yet proceeded with the
27  hearing without you, and made his comments about you nevertheless.

28

1

2      Again, Mr. Silao requests - in the strongest of terms - that you reconsider your
       position and do the right thing to prevent him from paying the Trustee's fees and
3      costs. Doing so will certainly impact heavily on Mr. Silao's decision to sue you and/or
       report you the State Bar. Again, please advise by close of business on **Tuesday 9-14-**
       **2021 at 5:00pm,** whether you will comply. [4]

4      This Court must order Bereliani to solely pay Plaintiff's attorneys fees, so that then Plaintiff's

5      prejudice would be abated.

6                          iv.      **THE COURT ERRONEOUSLY ASSUMED CERTAIN FACTS ABOUT**

7                                   **THE DEFENDANT THAT ARE SIMPLY NOT ACCURATE**

8          At the 9-9-2021 hearing this Court unfairly lumped Defendant with his brothers and assumed

9      facts about his that were erroneous.

10         The first, was a misleading statement by Plaintiff's counsel that Defendant sat on his hands

11     and took advantage of the situation by not responding:

12         MR. POLIS: And one other final point that I was going to address without even
           knowing about this development, is not only did Mr. Silao not respond to or address
13         the RFA's which were in March of 2019, three months later -- and we have it in a
           declaration -- my office contacted him. He wasn't represented by counsel yet. We
14         contacted him at the phone number on the docket. I called him. That's in my
           declaration.  We sent a FedEx to the -- I remember it very clearly, 24 Central Park
15         South -- very nice neighborhood – *the unilateral status report*. He didn't respond to
           that. And then a few days later, Mr. Cohen comes in. So this kind of "Oops, I didn't
16         respond to the RFA's," this wasn't just a one-time strike. *He had many strikes*.
           [Emphasis added].
17
       [Transcript, p. 7, lines 11-24].
18
           There were not many strikes as Mr. Polis led this Court to believe. There was only one strike -
19
       the failure to respond to the RFAs.
20
           The Trustee's bill shows that on 8-8-2019, Plaintiff filed his Unilateral Pre-Trial Stipulation
21
       and Declaration [Doc-23] reporting that Defendant did not respond to Plaintiff's RFAs, and were
22
       deemed admitted. Both documents did not  attach a copy of the RFAs, and Plaintiff did not list the
23
       RFAs as an exhibit to be used at trial.
24
           The next day, on 8-9-2019, Defendant formally retained litigation counsel Baruch Cohen to
25
       defend him in this action, who then filed the *Substitution of Attorney* [Doc-25] on 8-12-2019, and
26

27         [4]A true and correct copy of Mr. Cohen's 9-11-2021 letter to Ms. Bereliani is attached hereto
       as Exhibit "4" and is incorporated herein by this reference.
28

wrote Plaintiff's counsel to meet & confer regarding Plaintiff's *Unilateral Pre Trial* [Doc-23] and

*Declaration* [Doc-24] in advance of the upcoming Pre Trial hearing of 8-22-2019. Cohen further

stated that Defendant <u>has</u> evidence to dispute Plaintiff's turnover claim for $137,000.00, that he has

witnesses and exhibits re same. Cohen produced these documents to counsel sight unseen, without

the Plaintiff having to formally demand them from Defendants to substantiate Defendant's claim that

he has exhibits to support his defense.

The second instance was unfair character assassinations of the Defendant:

> THE COURT: One of the things I want to hear from you – whatever else you were going to say, one of the things that I want to hear from you -- and a lot of this predates your involvement. And I'm glad eventually your client hired you. ***That was always the problem of your current client -- his two brothers' conduct in this case, in the adversary proceedings***. [Emphasis added].

[Transcript, p. 10, lines 7-13].

> THE COURT: ***They sort of had this cavalier attitude about these lawsuits***, and I think for a while they were -- not just Ms. Bereliani. There was another attorney, Christopher Prince, who I know very well, who I think the other two brothers were consulting but they refused to hire him as counsel of record and they were only trying to limit his involvement to settle. ***And there was a hearing where all three brothers were in my courtroom, and I really admonished that conduct***. [Emphasis added].

[Transcript, p. 10, lines 14-22].

> THE COURT:  But I'm looking at the fact pattern here. And ***Mr. Silao, he's not just a regular guy, a schlub. He's a doctor, went to college, went to medical school, a very successful practice***. [Emphasis added].

[Transcript, p. 11, lines 13-15].

> THE COURT:  He and his brothers sort of got in trouble for trying to run a business. **Oftentimes lawyers and *doctors are not very good businesspeople***. They're good at their profession.

[Transcript, p. 11, lines 16-19].

> THE COURT:  And I always find myself -- I see something like this a lot, and luckily before I became a judge I was at a law firm where we didn't have to take any ***schlub*** who walked in the door. ***And I would have just told Silao: "Get out of here. I'm your attorney or I'm not. This sort of way of trying to limit my engagement, I could do this but not that, I don't have time for this. Get out, get out of my office***." [Emphasis added].

[Transcript, p. 12, lines 1-7].

> THE COURT:  **And Ms. Bereliani is at fault for allowing that to happen. She should have just told him, "No, I'm not representing you on that basis." But Mr.**

1       **Silao himself is partly at fault for creating this situation**. [Emphasis added].

2 [Transcript, p. 12, lines 8-11].

3       Mr. Cohen argued against the Court's guilt-by-association of Defendant with his brothers:

4       MR. COHEN: Smoking gun, thank you. Mr. Polis mentioned that he FedEx'd the unilateral pretrial to my client at my client's address. So what. He subsequently
5       retained me.  There isn't accumulation of evidence of neglect by my client. **I understand the concern the Court has with the other two Silao brothers**.
6       [Emphasis added].

7 [Transcript, p. 13, lines 7-9].

8       Mr. Polis then accused Defendant of "gaming the system" stating that Defendant is a doctor:

9       MR. POLIS: **Just the point that your Honor raised as far as, you're right,** *we see doctors -- I see doctors all the time, dentists, et cetera. They think they're the*
10 *smartest ones in the room*, and let's face it, as the Court pointed out, notwithstanding obviously Mr. Cohen jumped in this case whenever that was, in August of '19, things
11 happened. If Mr. Cohen was in this thing from the get-go, we're not sitting here today. [Emphasis added].

12

13 [Transcript, p. 15, lines 14-21].

14       THE COURT: *As I said, Mr. Silao is not your typical individual being sued. It is a highly education person, probably top one percent of this country in terms of*
15 *educational level. I'm sure he thinks he's smarter than 99 percent of Americans. He sure acted that way when he was in my courtroom in person, all three Silao*
16 *brothers. They sort of had this attitude that being in court, being sued and having to deal with lawyers and judges was inconvenience to them, it was beneath them.*
17 [Emphasis added].

18 [Transcript, p. 19, lines 19-25, p.20, lines 1-2].

19       THE COURT:  It sort of -- I see that conduct a lot. In all the years that I've been a lawyer -- I've represented hospital, medical groups, I have to say a very common
20 attitude by doctors. *They somehow think the entire judicial system, judges and lawyers are contemptible people. They don't have time for this. They're saving lives.*
21 *They're at hospitals saving lives, and the idea that they have to come to my court in Riverside*. [Emphasis added].

22 [Transcript, p. 20, lines 3-10].

23       THE COURT: *The look on the three brothers' faces when they had to be here was just -- I found it a little irksome, that they had this attitude that they had to be*
24 *bothered to come to court*. [Emphasis added].

25 [Transcript, p. 20, lines 11-12].

26       Defendant is not a highly educated doctor, nor is he a "*schlub*." He did not "game the system."

27 His only mistake was in trusting Ms. Bereliani who did not produce to him Plaintiff's RFAs.

28

1    The Court assailed Defendant for not appearing at the Status Conference if he thought he was

2   no longer represented by counsel. That is unfair, since Ms. Bereliani herself expanded the scope of

3   her limited retention and represented Defendant at the hearing.  On 1-2-2019, notwithstanding her

4   limited scope of retention to *only* file an Answer, Bereliani subsequently participated in filing a Joint

5   Status Report [Doc-5]  and in the Joint Status Conference via an appearance attorney.

6    Recall, Ms. Bereliani's 8-9-2019 at 12:17pm, letter to Mr. Cohen:

7    "Ps I'll speak to my office regarding receipts of anything on their end but please note
***we were retained specifically for an answer and joint status report and conference***.

8   ***We had no further involvement or guidance***. Lastly, I appreciate your
professionalism going forward." [Emphasis added].

9

10   **[Note: notwithstanding Bereliani's retainer to *only* file an Answer, she wrote that she was *also***

**retained for the joint status report and conference].** How could the Court assume that Defendant

11   should have appeared, if he was under the impression by Ms. Bereliani that he was still represented

12   by counsel at the status conference?

13

14    Next, the Court assumed that Defendant will have issues with the IRS for not declaring the

15   repayment of the loan as income on his tax returns:

16   THE COURT:  And I get it, he thinks he paid it back. But I've got to tell you, there is
a problem here. If this was a loan, he needs to pay it back. If this wasn't a loan or he

17   thinks he paid it back, somewhere along the way, ***he should have treated this as
income. I suspect he didn't***. **One way or another, Mr. Silao is going to have a**

18   **problem. If he prevails here -- he got paid money from a corporation, his
employer,** ***he did not treat it as income, I'm guessing he didn't pay income tax on***

19   ***it. He treated it as a loan. If he prevails here somehow and says this wasn't a loan,
I -- he should have treated it as income when he got it. Unless he paid income taxes***

20   ***on it years back, he might have problems with the Internal Revenue Service if he
actually prevails***.  [Emphasis added].

21   [Transcript, p. 26, lines 12-25].

22    There is no requirement that Defendant is aware of to declare the repayment of a loan as

23   income on one's tax returns. Repayment of a loan is not taxable income.

24    Lastly, the Court assumed that the amount in controversy $137,000 is not a lot of money for

25   the Defendant to repay back to the estate:

26   THE COURT:  That's not the case here. Mr. Silao is a doctor. I don't know how
successful he is anymore, ***but I suspect at the very minimum, he's making good***

27   ***money. He's not being sued for a heck of a lot of money here***. [Emphasis added].

28

10/11-11:57am                                    -11-

///

[Transcript, p. 26, lines 8-12].

> THE COURT:  ***And it's not that big of a check to settle this***. I think the only reason the two other brothers settled is because they had to come to court, and I pretty much embarrassed them. You're a doctor, you're in Arizona, you're busy saving lives. Why are you flying back to California to litigate.... [Emphasis added].

[Transcript, p. 27, lines 1-6].

> THE COURT:  It sounds like this Silao brother doesn't live in California anymore either. Does Mr. Silao really want to come to Riverside, California to sit in my courtroom for a trial? I think it's worth some money not to do that. I don't know what his defenses are. Maybe he paid it back, maybe this wasn't a loan, who knows. ***But I can't imagine paying attorneys' fees, taking time off of work, flying out to California for a trial makes financial sense for Mr. Silao -- or Dr. Silao***. [Emphasis added].

[Transcript, p. 27, lines 18-25, p. 27, lines 1-2].

Contrary to the Court's assumption, $137,000 is indeed a lot of money for the Defendant, who is not a doctor, and he fully intends to fly to Los Angeles for the trial to vindicate his rights and set the record straight. Whether he wins at trial or not, he will litigate this case.

Finally, notwithstanding the tax return, Defendant will present his defense evidence to the Court that:

Pandora's loan report to the Silao brothers reflecting that during the period of 12-16-2013 - 5-20-2015, Defendant lent Pandora approximately $442,000.00 (and that his brothers Michael Silao lent Pandora $70,000.00, Sam Silao lent Pandora $6,000.00, & Ray Silao lent Pandora $143,911.37, totaling $662,411.37).

The last page of Pandora's 2014 tax return (FYE 12-31-2014) Form 1120, Page 5, Schedule L, Line 19, entitled: "*Loans **from** Shareholders*" showing that my client was owed $389,750.00 by Pandora for that year ("Loan Payable N Silao");

The last page of Pandora's 2015 tax return (FYE 12-31-2015) Form 1120, Page 5, Schedule L, Line 19, entitled: "*Loans **from** Shareholders*" showing that my client was owed between $389,750.00 - $297,250.00 by Pandora for that year ("Loan Payable N Silao");

Pandora's Balance Sheet as of 12-31-2015, under the section entitled: "Liabilities & Equity" reflecting "Loan/Financing Payable N. Silao $297,250.00;

The last page of Pandora's 2016 tax return (FYE 12-31-2016) Form 1120, Page 5, Schedule L, Line **_19_**, entitled: "*Loans **from** Shareholders*" showing that my client was owed between $297,250.00 - $295,250.00 by Pandora for that year ("Loan Payable N Silao");

Pandora's (9) checks to my client that contain the notation: "***Reimbursement - Loan***:"

       (1)    Pandora's 7-31-2015 check # 9001 to Defendant for $25,000.00;

       (2)    Pandora's 9-4-2015 check # 9002 to Defendant for $25,000.00 contains the notation: "***Loan Repayment***;"

       (3)    Pandora's 9-15-2015 check # 1112 to Defendant for $2,500.00 contains the notation: "***Reimbursement - Loan***;"

       (4)    Pandora's 10-9-2015 check # 9003 to Defendant for $25,000.00 contains the notation: "***Loan Repayment***;"

       (5)    Pandora's 10-15-2015 check # 1130 to Defendant for $2,500.00 contains the notation: "***Reimbursement***;"

       (6)    Pandora's 11-1-2015 check # 1131 to Defendant for $2,500.00 contains the notation: "***Reimbursement;***"

       (7)    Pandora's 11-2-2015 check # 0005 to Defendant for $25,000.00 contains the notation: "***Loan Repayment***;"

       (8)    Pandora's 12-1-2015 check # 1132 to Defendant for $2,500.00 contains the notation: "***Reimbursement***;"

       (9)    Pandora's 12-2-2015 check # 8655 to Defendant for $25,000.00 contains the notation: "***Loan Repayment***."

b.    **CONCLUSION**

The Court has made various assumptions about Defendant, partially fueled by the Plaintiff's misleading statements, that are simply not accurate. The Court is asked to press pause and rethink it's assumptions, to give the Defendant his day in court. A horrible injustice has been done to the Defendant, by Ms. Bereliani, that she alone must pay for.

For the foregoing reasons, Defendant requests that the Court reduce Plaintiff's fees of

1    $18,905.00 by $4,750.00 down to $14,155.00, that Ms. Bereliani be solely liable to pay them, that

2    Defendant not be ordered to pay them, and that the Court continue to grant the motion without it's

3    caveats.

4    DATED:         October 11, 2021          LAW OFFICE OF BARUCH C. COHEN, APLC

5                                             By ____/s/ Baruch C. Cohen_____
                                             Baruch C. Cohen, Esq.
6                                             *Attorney For Defendant Nicholas Silao*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10/11-11:57am                                -14-

# DECLARATION OF BARUCH C. COHEN

I, BARUCH C. COHEN, declare as follows:

2. The facts stated below are true and correct within the best of my personal knowledge and if called upon to testify to them I could and would competently do so.

3. I am a member in good standing and eligible to practice before the following court(s): California State Supreme Court; US Court of Appeals - Ninth Circuit; Bankruptcy Appellate Panel; United States District Courts: Central District of CA; Eastern District of CA; Northern District of CA; & Southern District of CA.

4. I am the principal shareholder and President of The Law Office of Baruch C. Cohen. A Professional Law Corporation, located at 4929 Wilshire Boulevard, Suite 940, Los Angeles, California 90010. I proudly represent Defendant Nicholas Silao.

5. This declaration is in support of **DEFENDANT'S OBJECTION TO THE REASONABLENESS OF PLAINTIFF'S ATTORNEY FEES**.

6. A true and correct copy of the 9-9-2021 Transcript is attached hereto as Exhibit "1" and is incorporated herein by this reference.

7. A true and correct copy of my 9-10-2021 letter to Ms. Bereliani is attached hereto as Exhibit "2" and is incorporated herein by this reference.

8. A true and correct copy of Ms. Bereliani's 9-10-2021 letter to me is attached hereto as Exhibit "3" and is incorporated herein by this reference.

9. A true and correct copy of my 9-11-2021 letter to Ms. Bereliani is attached hereto as Exhibit "4" and is incorporated herein by this reference.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

DATED: October 11, 2021

By ___*/s/ Baruch C. Cohen*___
Baruch C. Cohen, Esq.

# DECLARATION OF NICHOLAS SILAO

I, NICHOLAS SILAO, declare as follows:

1. The facts stated below are true and correct within the best of my personal knowledge and if called upon to testify to them I could and would competently do so.

2. I am the defendant in this case.

3. This declaration is in support of **DEFENDANT'S OBJECTION TO THE REASONABLENESS OF PLAINTIFF'S ATTORNEY FEES**

4. Forgive me if my recollection is not accurate, but I do not recall ever appearing before this Court.

5. I am not a medical doctor or any doctor for that matter.

6. I am unaware of any obligation to declare the repayment of the loan to me as taxable income on my tax returns.

7. Contrary to the Court's assumption, $137,000 is indeed a lot of money for me to repay, and I fully intend to fly to Los Angeles for the trial to vindicate my rights and set the record straight. Whether I win at trial or not, I will litigate this case.

8. On 10-25-2018, Sanaz S. Bereliani ("Bereliani") executed an ("initial") Attorney Client Fee Contract with me to ("only") file an Answer to the Complaint to prevent a default and charged me $850.00. Bereliani retainer agreement provided that she would notify me of "each step of the process." She did not honor the terms of her retainer and did not inform me of the Plaintiff's RFAs. Had she done so, I would have responded to it.

9. On 1-2-2019, notwithstanding her limited scope of retention to *only* file an Answer, Ms. Bereliani subsequently participated in filing a Joint Status Report [Doc-5] and in the Joint Status Conference via an appearance attorney. Bereliani did not consult with me before making any of the representations in the Status Report.

10. So while Bereliani's retainer was limited to only filing an Answer, it appears that Bereliani continued representing me past the filing of the Answer, into the Status Conference stage, and I was confused as to her representation of me.

11.    Ms. Bereliani's 8-9-2019 at 12:17pm, letter to Mr. Cohen stated:

"Ps I'll speak to my office regarding receipts of anything on their end but please note *we were retained specifically for an answer <u>and joint status report and conference</u>. We had no further involvement or guidance.* Lastly, I appreciate your professionalism going forward." [Emphasis added].

[Note: notwithstanding Bereliani's retainer to *only* file an Answer, she wrote that she was <u>*also*</u> retained for the joint status report and conference].

12.    I did not respond to Plaintiff's RFA's, because Bereliani never forwarded the RFA's to me, I never received them, and was not even aware of them.

13.    I did not appear at the status conference because it appeared that Ms. Bereliani was representing me at that stage of the case, notwithstanding my confusion.

14.    I did not "game the system" nor would I. I respect the Court, and do not think it is below me to defend my rights against this lawsuit.

15.    The Court has made various assumptions about me, partially fueled by the Plaintiff's misleading statements, that are simply not accurate. The Court is asked to press pause and rethink it's assumptions, to give me my day in court. A horrible injustice has been done to me, by Ms. Bereliani, that she alone must pay for.


I declare under penalty of perjury under the laws of the United States and the State of New York and of California that the foregoing is true and correct.

DATED: October 3, 2021

By _____

NICHOLAS SILAO

**EXHIBIT "1"**

1                    UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              --oOo--

4  In Re:                        ) Case No. 6:17-bk-19336-SY
                                 )
5  PANDORA HOSPICE CARE, INC.,   ) Chapter 7
                                 )
6           Debtor.              ) Riverside, California
   _____) Thursday, September 9, 2021
7                                ) 10:00 a.m.
   ANDERSON, CHAPTER 7           )
8  TRUSTEE,                      ) Adv. No. 6:18-ap-01193-SY
                                 )
9           Plaintiff,           )
                                 )
10     vs.                       )
                                 )
11 SILAO,                        )
                                 )
12          Defendant.           )
   _____)
13

14                              CONT'D DEFENDANT'S RENEWED
                                MOTION TO ALLOW WITHDRAWAL OF
15                              DEEMED ADMISSIONS F.R.C.P.
                                36(B)
16

17                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE SCOTT H. YUN
18               UNITED STATES BANKRUPTCY JUDGE

19 APPEARANCES:

20 For the Plaintiff:           THOMAS J. POLIS, ESQ.
                                Polis & Associates, APLC
21                              340 South Farrell Drove
                                Suite A210
22                              Palm Springs, California 92262

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service

ii

1  APPEARANCES: (cont'd.)

2  For the Defendant:            BARUCH C. COHEN, ESQ.
                                 Law Office of Baruch C. Cohen,
3                                  APLC
                                 4929 Wilshire Boulevard
4                                Suite 940
                                 Los Angeles, California 90010
5                                (323) 937-4501

6  Court Recorder:               Shari Mason
                                 United States Bankruptcy Court
7                                3420 Twelfth Street
                                 Riverside, California 92501

8

9  Transcriber:                  Briggs Reporting Company, Inc.
                                 9711 Cactus Street
10                               Suite B
                                 Lakeside, California 92040
11                               (310) 410-4151

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1   RIVERSIDE, CALIFORNIA THURSDAY, SEPTEMBER 9, 2021 10:00 AM

2                              --oOo--

3       (Call to order of the Court.)

4           THE COURT:  This is the Court's 10:00 a.m.

5   calendar, September 9th.  There's only one matter set for

6   hearing, Pandora Hospice Care, Chapter 7 Trustee versus

7   Silao.  This is defendant's motion to allow the withdrawal

8   of deemed admissions.

9           Let's start by getting appearances.

10          MR. COHEN:  Good morning, your Honor.  Baruch

11  Cohen representing the defendant.

12          I apologize for not having a tie, but I left the

13  office -- I left my home this morning without a tie.

14          THE COURT:  Not a problem.  Good morning, Mr.

15  Cohen.

16          MR. POLIS:  I told him I'd give him the back of my

17  tie.

18          Good morning, your Honor.  Tom Polis on behalf of

19  the trustee, Karl T. Anderson.

20          Mr. Anderson.

21          MR. ANDERSON:  Good morning, your Honor.  Karl

22  Anderson, the Chapter 7 trustee.

23          THE COURT:  Good morning, gentlemen.

24          MR. POLIS:  And also my legal assistant, Cristina

25  Allen, is here to testify to all the things we did.

*Briggs Reporting Company, Inc.*

2

1          THE COURT:  Good morning.

2          MS. ALLEN:  Good morning.

3          THE COURT:  Please, everyone be seated.

4          So I leave it up to everyone whether or not they

5   want to keep their mask on.  The minute you walk outside of

6   my courtroom, you have to put the mask back on.  In the

7   courtroom is the only place where I have any power.  I'm

8   fully vaccinated.  I feel comfortable, so I leave it up

9   to -- every person has a different view of the risk of

10  COVID-19, so I leave it up to individuals whether they want

11  to keep the mask on or not.

12         Now, I've heard from my staff.  I'm not sure how to

13  proceed today.  The person who I really, really, really

14  wanted to see in my courtroom is defendant's former counsel,

15  Ms. Bereliani.  She's not here.  I understand that she wants

16  to call in or she wanted to do it by Zoom.  Unfortunately, I

17  don't have that capability in my courtroom.

18         Each judge, some time in this coming year, we're

19  going to be allowed to have technology where we can do hybrid

20  hearings in person and via Zoom.  I don't have that yet.  I

21  hope to have that technology soon, but I don't have it in my

22  courtroom.  That's not a possibility.

23         To me, a telephonic testimony of Ms. Bereliani is

24  not going to cut it.  The only reason why this matter has

25  been continued for so long is because I really wanted to see

3

1 Ms. Bereliani in my courtroom on the witness stand.

2        I appreciate the fact that, Mr. Polis, you brought

3 Ms. Allen with you, but I don't think the defendant has, at

4 least in writing, a question whether or not the request for

5 admissions was served.  I don't think that's in dispute.

6        MR. COHEN:  Correct.

7        THE COURT:  So the only real thing -- I've already

8 reviewed all the pleadings.  I've reviewed it again because

9 this matter has been continued for so long.

10        The only person -- I leave it up to the parties

11 what they want to do, how they want to proceed.  But the only

12 person that I really truly want to see in my courtroom

13 testify is Ms. Bereliani.  And I am a little peeved at

14 Ms. Bereliani, who signed that stipulation -- it's not as if

15 she didn't sign it -- that she's been subpoenaed to be here.

16 Sometimes that happens when somebody's compelled to appear in

17 court via subpoena, they're not cooperative.

18        But she signed that stipulation.  She's not here.

19 And I'm sort of at a loss of how to proceed today.  We could

20 do it many different ways.  We can obviously continue this

21 for Ms. Bereliani to be here, but it's -- not too happy about

22 that.

23        I can just rule on the papers.  All the relevant

24 parties submitted a declaration, including Ms. Bereliani, and

25 I could just review it and then give you my ruling.  It

4

1  probably won't be today, because I have not fully formed my

2  decision because I thought we were going to have in-person

3  testimony today.

4          But let me hear from the parties.

5          Mr. Cohen, do you have any thoughts or suggestions

6  on how we should proceed today?

7          MR. COHEN:  I do.

8          THE COURT:  Okay.

9          MR. COHEN:  In reviewing the paperwork myself, I

10 caught something that I did not catch earlier in the written

11 pleadings.  And I refer to Ms. Bereliani's letter.  It's

12 Exhibit 16 to the motion.

13         THE COURT:  Okay.

14         MR. COHEN:  You know, sometimes when you highlight

15 something to the Court, you tend to focus on only what was

16 highlighted, but sometimes you fail to catch the preceding

17 sentence which has even a greater kick.

18         Your Honor, the issue here, as I said quoting the

19 Watergate case, is what did she have and what did she know

20 and when did she know it.  In Bereliani's letter, she writes

21 the following:  "I do have them since they were sent to me

22 via email per my request but not before then."

23         Now, it's a bit vague, but this was in response to

24 my letter complaining why -- you know, I didn't get -- send

25 me the RFA's if you have them.  And she says, "I do have them

5

1 since they were sent to me via email per my request but not

2 before then."

3         I highlighted the next sentence, that "Also we were

4 not retained for work in addition to filing an answer,

5 attending the status conference."  I focused on the second

6 sentence.

7         But here we have her own letter, that if I'm

8 reading it correctly, she is saying that she had them.  And

9 if she had them, she certainly didn't produce them to me and

10 my client when I wrote her on August -- when my client

11 demanded his file pursuant to the California Rules of

12 Professional Responsibility 4-100 that requires that an

13 attorney produce and return the whole file.

14         And when she responded on August 7, 2019, she only

15 sent me 12 documents.  The plaintiff's RFA's weren't in

16 there.

17         So I dare say -- whether she was retained on a

18 limited basis to just merely file an answer to avoid default

19 or whether she was also magically retained to handle the

20 joint status report which requires that she try the case, I

21 submit, your Honor, that her exhibits -- our Exhibit 16 where

22 she said "I do have them" -- the full sentence is that "As of

23 your substitution in the case, I do have them since they were

24 sent to me via email per my request but not before then."

25         I'm not entirely sure what that means, but I read

6

1  it to mean she had it.  And if she had it, she certainly

2  didn't produce it to my client.  And therefore, the motion

3  should be granted on the basis that the Court has discretion

4  to not have the self-executing nature of FRCP 36 used against

5  my client, notwithstanding the fact that plaintiff never

6  issued the initial disclosures that permit discovery to go

7  thereafter.

8          So I submit, your Honor, that even without

9  Ms. Bereliani's live testimony, I think we have enough on the

10 record for the Court to hang its hat and say, well, she

11 admits she had it, she didn't produce it.  My client signed a

12 declaration that he never received it.  He should not be

13 held -- punished for this.

14         THE COURT:  Thank you, Mr. Cohen.

15         Mr. Polis.  You can address just the procedure

16 issue of how you want to proceed today or you can just

17 respond to Mr. Cohen's argument as well.

18         MR. POLIS:  With all due respect to Mr. Cohen --

19 you know, I've been friends for many years -- I think he has

20 just basically laid out what I see as a smoking gun, so to

21 speak, in the sense that she now admits she had these RFA's.

22         And my firm, my office on behalf of Mr. Anderson,

23 proceeded as if they were received and she admits she

24 received them.  We proceeded to do everything we were

25 supposed to do, unilateral status report.  And then Mr. Cohen

7

1  comes in.  So -- and again, we have a situation where -- and

2  I appreciate this sort of smoking gun that Mr. Cohen is

3  focused on for the Court.

4        And I think at this point, the Court has to deny

5  the motion.  And if the Court, on the other hand, is inclined

6  to grant the motion, at a minimum my firm's fees on behalf of

7  Mr. Anderson -- which we've put in a declaration -- need to

8  be part of any order that in any way rescinds the deemed

9  admissions.  And where that money comes from is between Mr.

10 Silao and Ms. Bereliani.

11       And one other final point that I was going to

12 address without even knowing about this development, is not

13 only did Mr. Silao not respond to or address the RFA's which

14 were in March of 2019, three months later -- and we have it

15 in a declaration -- my office contacted him.  He wasn't

16 represented by counsel yet.  We contacted him at the phone

17 number on the docket.  I called him.  That's in my

18 declaration.

19       We sent a FedEx to the -- I remember it very

20 clearly, 24 Central Park South -- very nice neighborhood --

21 the unilateral status report.  He didn't respond to that.

22 And then a few days later, Mr. Cohen comes in.

23       So this kind of "Oops, I didn't respond to the

24 RFA's," this wasn't just a one-time strike.  He had many

25 strikes.  And I know the Court has a lot of discretion.  I

8

1 know that the Ninth Circuit is clear, we want to try matters

2 on their merits.  But in a case like this where now it

3 appears there's an admission that his former counsel had the

4 RFA's, they chose not to respond and then chose not to

5 participate in the joint status report process -- he

6 obviously didn't care about this until somebody read that it

7 was -- that was really happening here -- or actually cared

8 what was happening, that this was serious money the trustee

9 was going after.

10       And one other final point I think Mr. Cohen

11 referenced in his papers as far as likelihood of success on

12 the merits is the tax return that we refer to.  And as your

13 Honor is well aware, Mr. Anderson as a trustee is also an

14 accountant, that the 2016 tax return, the last return we had

15 before this case was filed, shows $137,000 loan payable by

16 an insider, Mr. Silao, to this corporate entity.

17       So -- and his two brothers, who as the Court may

18 recall, now, whenever, a year, almost two years ago, we

19 obtained judgments against and they paid and settled it,

20 settled both of those.

21       But in this case, the combined fact of the tax

22 return, which everyone now wants to disavow -- which we see

23 constantly in bankruptcy cases, "Oh, I didn't really mean

24 that" -- combined with the fact that Mr. Silao now -- former

25 counsel admits to having the RFA's and failed to participate

9

1   in the process -- he didn't care.

2        Well, we cared.  He had his chance.  And we would

3   ask the Court to deny the motion.

4        THE COURT:  It's sort of beyond the scope of

5   what's here today, but I did prepare for today -- read the

6   complaint, read the answer, read the entire docket, all the

7   relevant things that happened in this case.  Who signed that

8   tax return?

9        MR. POLIS:  Mr. Silao -- well, I was looking at it

10  just the other day, your Honor.  The version that was

11  provided to us by the corporate debtor's counsel -- a big

12  law firm, I can't remember the name now.  They produced 1100

13  pages of documents, because they were all Bates stamped and

14  what you would see from a big firm.

15       THE COURT:  I think it was Keith Owens who does a

16  lot of healthcare.

17       MR. POLIS:  Yes, yes.  The 2016 tax return has a

18  signature block for Nicholas Silao.  It's not signed.  We

19  don't usually get, it seems like, signed tax returns,

20  because I don't know who signs tax returns anymore.  They're

21  all filed electronically.

22       THE COURT:  Right.

23       MR. POLIS:  But Mr. Silao, Nicholas Silao, this

24  defendant, signed that tax return.  Very good point, your

25  Honor.

10

1      THE COURT:  It's sort of beyond the scope of

2  today's hearing, but I was curious because I -- I haven't

3  heard anyone -- neither side has argued for a continuance to

4  have Ms. Bereliani, defendant's former counsel, here.  So I

5  am going to proceed today and rule, but I do want to hear

6  from Mr. Cohen again, so Mr. Polis, you can sit.

7      One of the things I want to hear from you --

8  whatever else you were going to say, one of the things that

9  I want to hear from you -- and a lot of this predates your

10  involvement.  And I'm glad eventually your client hired you.

11  That was always the problem of your current client -- his

12  two brothers' conduct in this case, in the adversary

13  proceedings.

14      They sort of had this cavalier attitude about

15  these lawsuits, and I think for a while they were -- not

16  just Ms. Bereliani.  There was another attorney, Christopher

17  Prince, who I know very well, who I think the other two

18  brothers were consulting but they refused to hire him as

19  counsel of record and they were only trying to limit his

20  involvement to settle.  And there was a hearing where all

21  three brothers were in my courtroom, and I really admonished

22  that conduct.

23      Attorneys are in or out.  But trying to hire

24  attorneys the way they wanted to manage it just didn't make

25  any sense, and it eventually got the two other brothers --

11

1 not your client, the other brothers -- in trouble because

2 they eventually faced default situations and they were

3 behind the 8-ball.  And not surprisingly, they settled and

4 they're out of the adversaries now.

5         I'm now looking at your client's conduct with his

6 prior counsel where he basically tried to do the same thing

7 that his brother did with Christopher Prince.  And this mess

8 that he finds himself in, he's culpable.

9         Ultimately, Ms. Bereliani should have done more.

10 She should have at a very minimum sent the request for

11 admissions and other discovery requests to you, Mr. Cohen.

12 But I'm looking at the fact pattern here.  And Mr. Silao,

13 he's not just a regular guy, a schlub.  He's a doctor, went

14 to college, went to medical school, a very successful

15 practice.

16         He and his brothers sort of got in trouble for

17 trying to run a business.  Oftentimes lawyers and doctors

18 are not very good businesspeople.  They're good at their

19 profession.

20         But I'm looking at this, and I'm not sure I should

21 give Mr. Silao a complete pass, because the confusion and

22 what happened with Ms. Bereliani is to a great extent the

23 fault of Mr. Silao who tried to -- he and his brothers.

24 Their conduct with lawyers is just not what you should do.

25 You either hire lawyers or you don't.

12

1          And I always find myself -- I see something like

2  this a lot, and luckily before I became a judge I was at a

3  law firm where we didn't have to take any schlub who walked

4  in the door.  And I would have just told Silao:  "Get out of

5  here.  I'm your attorney or I'm not.  This sort of way of

6  trying to limit my engagement, I could do this but not that,

7  I don't have time for this.  Get out, get out of my office."

8          And Ms. Bereliani is at fault for allowing that to

9  happen.  She should have just told him, "No, I'm not

10 representing you on that basis."  But Mr. Silao himself is

11 partly at fault for creating this situation.

12         So I think they're both culpable for what happened

13 here.  And I feel bad for you, Mr. Cohen.  I think you were

14 just walking down the street and stepped on gum.  You're

15 stuck with this client now.

16         And I see both of them, both the former lawyer and

17 your client are equally responsible for the situation that I

18 have before me.  And I have a hard time trying to apportion

19 that other than 50/50 where both of them are liable so both

20 of them should be jointly held responsible for what happened

21 here.

22         So whatever you want to say in response to Mr.

23 Polis and this issue that I raised, Mr. Cohen.

24         MR. COHEN:  Thank you.

25         Mr. Polis spoke about a smokescreen that I just

*Briggs Reporting Company, Inc.*

13

1   dropped on the Court.  Well, the smokescreen --

2           MR. POLIS:  Smoking gun.

3           MR. COHEN:  Smoking gun, thank you.

4           Mr. Polis mentioned that he FedEx'd the unilateral

5   pretrial to my client at my client's address.  So what.  He

6   subsequently retained me.

7           There isn't accumulation of evidence of neglect by

8   my client.  I understand the concern the Court has with the

9   other two Silao brothers.  But as far as this motion is

10  concerned, there is only one controlling issue, and that is

11  whether the RFA's should be deemed admitted or not.

12          We've presented evidence that Silao did not

13  receive the RFA's.  He can't divine it.  This is not an act

14  of playing games with the Court if he never received it.

15          All arrows point to Ms. Bereliani.  Either she had

16  it and failed to turn it over or she didn't have it and it

17  got lost in the shuffle or she had it and stood on ceremony

18  and said, "You know what, since I'm not retained I'm not

19  producing it to you."

20          Furthermore, there is no focus on the fact that

21  this discovery never should have been issued in the first

22  place without the initial disclosures.

23          So in terms of apportionment, I don't see any

24  basis by which Mr. Silao, my client, can be judged guilty,

25  so to speak, by the sins of his brothers.  In this case, in

14

1  this narrow picture, there is no instance where he was

2  playing games with the RFA's.

3          In fact, at the last hearing when we argued it,

4  this Court believed Mr. Silao, said his presence is not

5  required at the hearing.  And his declaration states

6  emphatically -- and as I wrote to Mr. Polis, my client

7  swears over a stack of Bibles he never received it.  The

8  spirit of FRCP 36 is that we punish the person who knows

9  about the deadline, received the pleading and didn't

10 respond.

11         Here we have a situation that the Code was

12 designed to factor in.  If the defendant never received the

13 RFA's, it is simply unfair to punish him.  Plus the

14 nanosecond I was retained, I provided verified responses at

15 the first available opportunity.

16         So to punish the debtor at this stage and have

17 them deemed admitted is unfair.

18         Now, again, the smoking -- what was the term?

19         MR. POLIS:  Smoking gun.

20         MR. COHEN:  The smoking gun that I raised earlier,

21 it could mean that she had it.  Again, as I said earlier,

22 I'm not entirely sure.  But as to apportionment, I would

23 urge the Court to just simply focus on Ms. Bereliani.  I

24 know that there's CCP 473(b) that says that when a lawyer

25 falls on her sword, they can prevent a default from

15

1  occurring.  I don't know if there's an equivalent in federal

2  practice.

3         But the CCP does say that when a lawyer makes that

4  statement, they have to pay the fees.  I would urge the

5  Court to adopt CCP 473(b), at least the spirit of it, and

6  say:  Based on the above, Ms. Bereliani should be

7  responsible for paying the fees.

8         And if she doesn't, my client should still not be

9  penalized.  It would be an issue, in fact, between the

10  trustee and Ms. Bereliani or the Court and Ms. Bereliani.

11  But my client was the innocent victim here.

12         THE COURT:  Thank you, MR. COHEN.

13         Any last words, Mr. Polis?

14         MR. POLIS:  Just the point that your Honor raised

15  as far as, you're right, we see doctors -- I see doctors all

16  the time, dentists, et cetera.  They think they're the

17  smartest ones in the room, and let's face it, as the Court

18  pointed out, notwithstanding obviously Mr. Cohen jumped in

19  this case whenever that was, in August of '19, things

20  happened.  If Mr. Cohen was in this thing from the get-go,

21  we're not sitting here today.

22         But the point is, this defendant tried to game the

23  system.  And sort of coming around third, thinking he had

24  gamed the system, oops, he didn't game the system.  He

25  basically set up the perfect storm, and this is it.  But,

16

1   again, as the Court pointed out, he started this by:  You're

2   in, you're out, you're not in.  You know, okay, well, let me

3   not do anything, and oops, this is serious.

4           That's gaming the system.  I would ask the Court

5   to deny the motion.

6           THE COURT:  All right.  Mr. Cohen.

7           MR. COHEN:  I don't know what "gaming the system"

8   means.  The defendant retained Bereliani on a limited

9   retainer to file an answer to avoid default.  That is about

10  the extent of what I see he did wrong, so to speak.

11          But nevertheless, Bereliani's retainer said that

12  she would notify the client of every step of the way.  She

13  didn't.  She actually executed a joint status report without

14  conferring with my client.  She made representations to the

15  Court about mediation and trial length.  She's confused my

16  client regarding the scope of her retention.

17          Lawyer clients get into disputes all the time, but

18  that's not evidence of gaming the system.  Okay?

19          Now, the Court asked about -- which is beyond the

20  scope of this motion -- about who signed the tax return.

21  It's an issue for trial, not an issue for today.

22          And pursuant to the verified responses to the

23  RFA's, we produced voluntarily, without wasting any time,

24  the checks to my client that contained a notation of

25  reimbursement of loan, evidencing that they were repaid --

17

1 I'm sorry, that the monies that my client received was a

2 reimbursement for the loan that my client advanced to the

3 company.  That's an issue for trial.  That's not an issue

4 for today.

5        What to do and where do we go from here, I think

6 there still remains an ambiguity as to the Bereliani

7 statement in that exhibit that I brought to the Court's

8 attention.  I think the more egregious her malpractice, the

9 more apportionment she should share.  If indeed that

10 statement is to be read that she had the RFA's and didn't

11 produce them to my client, no greater evidence can be

12 presented that my client was not gaming the system but was

13 the innocent victim of a negligent attorney.

14        THE COURT:  Thank you, Mr. Cohen.

15        All right.  So I am going to rule today without

16 testimony from Ms. Bereliani.  I'm going to grant the motion

17 in part.  I will have the request for admissions deemed

18 withdrawn, but it will be subject to compensating the

19 trustee and the bankruptcy estate for the attorneys' fees

20 and costs incurred by the trustee and trustee's counsel.

21        I don't have full evidence of that, so I'm going

22 to give an opportunity for Mr. Polis to provide billing

23 detail related just to this dispute regarding the request

24 for admissions dispute.

25        I will give all parties, including Ms. Bereliani,

18

1  an opportunity to object.  I'm inclined to make whatever the

2  final attorney fees and costs be jointly and severally

3  liable between Ms. Bereliani and Mr. Silao.

4          I'll give one caveat.  One caveat.  Unless before

5  the hearing -- I'm going to continue the hearing.  And that

6  could just become telephonic, people don't have to come --

7  if Ms. Bereliani actually files a declaration under penalty

8  of perjury saying it is her fault, Mr. Silao bears no

9  responsibility, I might reconsider the apportionment.

10 Rather than they're both jointly and severally liable for

11 the attorney fees, that it might be reapportioned either

12 more to Ms. Bereliani or completely Ms. Bereliani.

13         But what I have today, the email that's attached

14 as an exhibit, is not a statement.

15         Mr. Cohen, you're right, it is ambiguous.  She

16 sort of says, "I had it but because of my limited scope of

17 engagement, I didn't respond."  It doesn't really fall on

18 the sword.

19         So even if I apply the California Code of Civil

20 Procedure here -- it's not applicable here.  I know of no

21 equivalent under the Federal Rules of Bankruptcy Procedure.

22 But even if I were inclined to adopt some -- as an equitable

23 remedy that I'm allowed to do under the Federal Rules of

24 Bankruptcy Procedure, use that as a consideration for who

25 should be responsible for this, I need to see a definitive

19

1  stip by Ms. Bereliani that she's solely at fault.

2        If not, if she won't give that, both Mr. Silao and

3  Ms. Bereliani are jointly responsible for compensating the

4  bankruptcy estate for the cost of dealing with this

5  discovery dispute.

6        To me, if there is a problem between Mr. Silao and

7  Ms. Bereliani, Mr. Silao should just sue her for

8  malpractice.  If he has to pay for all of this, he should

9  just sue her for malpractice.  That dispute as between Mr.

10 Silao and Ms. Bereliani, that's between them.  They should

11 resolve it, not here, somewhere else.

12       But from the perspective of this case, bankruptcy

13 estate, the estate should be compensated for -- and here,

14 I'm really focusing on Mr. Silao's conduct.  While I am not

15 inclined to let him off the hook unless Ms. Bereliani really

16 falls on the sword and says she's personally responsible, no

17 one else is, she's going to pay this fee, the attorney fees

18 and costs incurred by the estate.

19       As I said, Mr. Silao is not your typical

20 individual being sued.  It is a highly education person,

21 probably top one percent of this country in terms of

22 educational level.  I'm sure he thinks he's smarter than 99

23 percent of Americans.  He sure acted that way when he was in

24 my courtroom in person, all three Silao brothers.  They sort

25 of had this attitude that being in court, being sued and

20

1 having to deal with lawyers and judges was inconvenience to

2 them, it was beneath them.

3          It sort of -- I see that conduct a lot.  In all

4 the years that I've been a lawyer -- I've represented

5 hospital, medical groups, I have to say a very common

6 attitude by doctors.  They somehow think the entire judicial

7 system, judges and lawyers are contemptible people.  They

8 don't have time for this.  They're saving lives.  They're at

9 hospitals saving lives, and the idea that they have to come

10 to my court in Riverside.

11          The look on the three brothers' faces when they

12 had to be here was just -- I found it a little irksome, that

13 they had this attitude that they had to be bothered to come

14 to court.

15          And I have to say this Silao brother -- putting

16 aside the two brothers who settled -- the conduct here of

17 what happened, he bears a lot of responsibility for this,

18 trying to hire an attorney who frankly in all the years that

19 I've seen Ms. Bereliani in my courtroom, I mean she does

20 consumer debtor work.  I've almost never seen her really do

21 adversary proceedings in litigation.

22          So he wanted to hire a lawyer on the cheap rather

23 than somebody who can actually litigate a defendant.  It's

24 clear to me he did not find the right attorney for this job

25 if he was really going to litigate it.  He tried to limit

21

1 her representation.

2          At least according to Ms. Bereliani, when she

3 wanted feedback of what more she should do, he was not

4 communicating to her.  I think both of them bear

5 responsibility for that.  I'm letting Mr. Silao off the

6 hook.

7          And why I am not going to -- unless Ms. Bereliani

8 under penalty of perjury says she's solely responsible,

9 she's going to pay the attorneys' fees herself, why I'm not

10 letting him out, long before we got to the point of request

11 for admissions being deemed allowed, there was a court

12 order, there was a discovery cutoff.

13          So for him, the idea that, well, there was a

14 discovery cutoff in -- when was the discovery -- June 20,

15 2019.  The idea that somehow he thought, well, the plaintiff

16 served no discovery, even if he's not a lawyer and he's

17 transitioning from one attorney to the other attorney, if he

18 somehow thought the plaintiff, the bankruptcy trustee and

19 his experienced counsel did not serve discovery at all and

20 let the discovery cutoff deadline pass, I mean that's

21 wishful thinking at best.

22          So I'm looking at the timing of what happened

23 here.  There was a status conference.  Mr. Silao was sort of

24 lackadaisical about preparing for that, did not give clear

25 instructions to Ms. Bereliani about what she needs to do.

22

1    So she, in her desperation, decided to do more than what she

2    contracted to do for Mr. Silao and had another attorney, Mr.

3    Smith, appear as a special appearance attorney.  And I

4    entered these deadlines.

5            And I'm going to go back to the one legal issue

6    that was raised, the idea that because there was no initial

7    disclosure, discovery should not have been propounded.

8    Well, the rules are clear.  That's generally true unless the

9    Court orders otherwise.

10           I following the status conference entered a

11   scheduling order that established a discovery cutoff

12   deadline, meaning the parties are free to conduct discovery.

13   At no time did Mr. Silao or any of the attorneys say at the

14   status conference, "No discovery.  We have not done our

15   initial disclosure."  In fact, based on what they put in the

16   status report, I said, "I'm proposing these dates, including

17   discovery cutoff.  Anyone have objections?"

18           I read that transcript.  No one had objections.

19   Everyone said yes, the discovery cutoff is a good date.

20           So now there's a court order allowing for

21   discovery.  So that one legal argument that because there

22   was no initial disclosure, discovery should not have

23   happened, the rules are clear.  The court order trumps the

24   Federal Rules of Bankruptcy Procedure Rule 26 position that

25   you can't do discovery unless there's an initial disclosure.

*Briggs Reporting Company, Inc.*

23

1        The court order trumps that, and I entered an

2   order allowing the parties to conduct discovery and

3   established a discovery cutoff.  I asked Mr. Smith point

4   blank, "Do you have any problems with these dates?"  "No,

5   your Honor."  So an order was entered.

6        Mr. Silao, if he wasn't sure who was going to

7   represent him at that status conference, should have been

8   here in person or by phone, once again chose not to be here.

9   So I can't give him a pass either.

10       If you found yourself in a position where you

11  hired an attorney just to file an answer, not to do anything

12  more, then he should have made himself available and come to

13  court.  He wasn't here.  So I'm not giving him a pass for

14  not being here.  So he's responsible for that as well.

15       So I set a discovery cutoff.  That trumps the rule

16  that you can't have discovery until there's an initial

17  disclosure.  Mr. Silao did not participate in that status

18  conference himself, even though -- if he's standing on the

19  position that my retainer agreement with Ms. Bereliani only

20  allowed her to do certain things, then he should have been

21  here.

22       He's a highly educated man.  If he said, "My

23  retainer agreement with her made it clear all you're doing

24  is filing an answer and nothing more," he should have made

25  himself available and come to the status conference himself.

24

1  He didn't do that.  So I think he's responsible for the mess

2  that's been created so that's going to be my ruling.

3          What I'm going to do is continue this hearing, not

4  as an evidentiary hearing, as a regular hearing.  I'm going

5  to give Mr. Polis an opportunity to submit his billing

6  records, serve it on Mr. Cohen as counsel for Mr. Silao,

7  also serve it on Ms. Bereliani.  I think she

8  should be given an opportunity to object to the fees if she

9  thinks they're not reasonable.

10          We'll have a continued hearing and it would just

11  be to determine the amount.

12          And one other issue is this sort of falling-on-

13  the-sword declaration.  And if I see it, if I find that

14  convincing, I may change my mind about who needs to pay it.

15  But once again, this payment is important.  They're only

16  deemed withdrawn if a payment is made.  So at the next

17  hearing, I'm going to give a deadline by which a check has

18  to be tendered.

19          So how long do you need, Mr. Polis, for you to

20  prepare your billing records and serve it out?

21          MR. POLIS:  Let's say by the 24th of September, so

22  two weeks from tomorrow.

23          THE COURT:  By September 24th, the billing records

24  should be filed and served out.  I will give anybody who

25  wants to file a response or an objection to those fees by

25

1   October 8th.

2           Does that work for you, Mr. Cohen?

3           MR. COHEN:  Your Honor, can I have the next

4   Friday, October 15th?

5           THE COURT:  That's fine, October 15th.  And we can

6   have a continued hearing on October 28th at --

7           MR. COHEN:  The week of the 28th -- my groaning

8   was because I'm booked the week of October 18th, the week of

9   October 25th, the week of November 1st.

10          My first available date for a hearing would be

11  November 11th.

12          MR. POLIS:  That's a holiday.

13          THE COURT:  That's Veterans Day.

14          MR. COHEN:  We could do Friday, November 12th.

15          THE COURT:  We can be back here November 18th.

16          MR. COHEN:  November 18th is great.

17          THE COURT:  You can call in.  I'll set this matter

18  November 18, 2021.  I'm going to set this at 10:30 a.m.,

19  separate from my regular cattle call motion calendar.

20          So that's sort of my ruling for today.

21          But I do want to take this opportunity since we

22  have both attorneys in the courtroom and Mr. Anderson is

23  here as well.  I've been really surprised why this matter

24  hasn't settled.  That's just my -- Mr. Silao, like I said,

25  is not just your Chapter 7 debtor being sued for

26

1   non-dischargeability who usually doesn't have money.  I am

2   often aggravated when non-dischargeability trials don't

3   settle and they go to trial.  The vast majority of debtors

4   really don't have money, they're never going to have money.

5   You have a nice judgment and you can frame it.  Are you

6   going to ever collect that from a debtor who already filed

7   for bankruptcy?

8          That's not the case here.  Mr. Silao is a doctor.

9   I don't know how successful he is anymore, but I suspect at

10  the very minimum, he's making good money.  He's not being

11  sued for a heck of a lot of money here.

12         And I get it, he thinks he paid it back.  But I've

13  got to tell you, there is a problem here.  If this was a

14  loan, he needs to pay it back.  If this wasn't a loan or he

15  thinks he paid it back, somewhere along the way, he should

16  have treated this as income.  I suspect he didn't.

17         One way or another, Mr. Silao is going to have a

18  problem.  If he prevails here -- he got paid money from a

19  corporation, his employer, he did not treat it as income,

20  I'm guessing he didn't pay income tax on it.  He treated it

21  as a loan.  If he prevails here somehow and says this wasn't

22  a loan, I -- he should have treated it as income when he got

23  it.  Unless he paid income taxes on it years back, he might

24  have problems with the Internal Revenue Service if he

25  actually prevails.

27

1          And it's not that big of a check to settle this.
2  I think the only reason the two other brothers settled is
3  because they had to come to court, and I pretty much
4  embarrassed them.  You're a doctor, you're in Arizona,
5  you're busy saving lives.  Why are you flying back to
6  California to litigate --
7          MR. POLIS:  $12,000.
8          THE COURT:  -- this?  Yeah.
9          MR. POLIS:  12,000 bucks, yeah.
10          THE COURT:  I basically told them, this is going
11  to be painful.  You want to go to trial, fine, but you're
12  going to be in my courtroom.  You're going to miss work.
13  You have to fly out here.  You have to stay in a hotel.
14          This doesn't make any sense.  It's a nuisance.
15  But they had this attitude, "I'm busy."
16          "Well, you're going to be missing a lot of work if
17  you're going to go to trial."
18          It sounds like this Silao brother doesn't live in
19  California anymore either.  Does Mr. Silao really want to
20  come to Riverside, California to sit in my courtroom for a
21  trial?
22          I think it's worth some money not to do that.  I
23  don't know what his defenses are.  Maybe he paid it back,
24  maybe this wasn't a loan, who knows.  But I can't imagine
25  paying attorneys' fees, taking time off of work, flying out

28

 1  to California for a trial makes financial sense for Mr.

 2  Silao -- or Dr. Silao.

 3          It doesn't make any sense.  And only after I like

 4  poured this on the two other brothers did they agree to

 5  settle.  But I told them, I get it.  You guys started a

 6  business.  It went bad.  You probably lost investment.

 7  You're mad about what happened to Pandora.  I get all of it.

 8          But litigating means you can't move on with your

 9  life.  You're still involved in Pandora years after the

10  fact.

11          And I told them:  There's no way you're going to

12  get out of this unless you settle, until you come to my

13  courtroom and spend a day or two in my courtroom going

14  through a trial.  I don't do direct testimony by

15  declaration.  Everybody has to come to court, direct, cross,

16  redirect.  There is no declaration for trial for me.

17          Mr. Anderson, he lives in my courtroom.  He's a

18  bankruptcy trustee.  He doesn't mind coming to trial.

19          But I suspect, Mr. Cohen, your client is not going

20  to be happy to fly out to California to sit in my courtroom

21  to go through a trial.

22          And a lot of attorneys think, oh, all the

23  bankruptcy judges do direct testimony by declaration.  I

24  don't do that.  I very quickly realized -- Meredith Jury,

25  she and I really didn't get along, my former colleague here.

29

1  The one thing I agreed with her 100 percent on, direct

2  testimony by declaration is a waste of time.  A 10-page

3  declaration draws a 100-page evidentiary objection.

4       If I let every witness take the stand, maybe

5  you'll get three objections.  I can go through direct

6  testimony in a courtroom in a matter of hours.  Having to

7  deal with direct testimony by declaration and having to deal

8  with a 100-page evidentiary objection is a waste of my time

9  because 99 percent of that evidentiary objection is garbage.

10 But I have to rule on them one by one.  I don't do that.

11      Everyone has to come to court, direct, cross,

12 redirect.  And it's amazing how quickly the trial goes when

13 you make everyone come to court.  All of a sudden, the 50

14 things the party had to testify become four things because

15 people realize, "I don't want to sit here all day.  There's

16 only four things that I really need to say."  And it's done.

17      If I make people write a declaration, they want to

18 tell me the story of their life.  I don't care.

19      So Mr. Silao should really think about this,

20 whether he really wants to -- if he's really living in New

21 York, whether he really wants to come out to California and

22 spend a couple days going through trial for $137,000.

23      For a debtor, it's hard for me to say that because

24 that's a lot of money, but I suspect for Dr. Silao, you

25 know, he doesn't -- nobody wants to write a check.  But I

30

1    think for Dr. Silao, it's not going to make or break him.

2            MR. POLIS:  Your Honor, can I ask a question?

3            THE COURT:  Sure.

4            MR. POLIS:  In light of your Honor's comments, and

5    obviously I'll talk to Mr. Cohen after this hearing, if

6    there's something that's put together, sort of a global

7    resolution, both the fees for the RFA issue and for the

8    underlying claim, we'll let your Honor know --

9            THE COURT:  Right.

10           MR. POLIS:  -- because right now, we're under a

11   briefing schedule.  But if it turns out in the next few

12   days, week or so, we come to sort of an agreement in

13   principle -- and obviously we'll have to notice under 9019.

14   But that can eliminate all the whatever, the hearing on the

15   18th of October, the 24th of September, these various

16   deadlines you've given us?

17           THE COURT:  Yes.  That would be welcome news to

18   me.  Like I said, I never understood why this matter didn't

19   settle.

20           Go ahead, Mr. Cohen.

21           MR. COHEN:  Thank you.  I hate to sound ignorant,

22   not aware that my client is a doctor --

23           THE COURT:  Oh.

24           MR. COHEN:  -- just to say.  He might be a doctor.

25   I know the other brother is a doctor.  I don't know his

31

1  level of education.  I know a lot of the Court's comments

2  were aimed at his level of sophistication as being a doctor,

3  and I don't know that he's a doctor.

4          Secondly, the October 15, 2021 opposition date,

5  the only wild card is I don't know Ms. Bereliani's schedule.

6  So I just want to throw in the possible flexibility that if

7  she needs additional time, how do we bring that to your --

8  are we stipping to that date, or are we flexible with that

9  opposition date?

10         THE COURT:  I'm sticking to that date because

11 Ms. Bereliani didn't make herself available.  The one person

12 I have no sympathy for here for a lot of reasons is

13 Ms. Bereliani.

14         MR. COHEN:  Okay.

15         THE COURT:  She could be here.  She's not.

16         MR. COHEN:  Third point of clarification, your

17 Honor is saying that because the Court ordered a discovery

18 cutoff, that that trumped FRCP 26 that requires initial

19 disclosures beforehand.

20         My understanding -- correct me if I'm wrong -- is

21 that when your Honor scheduled discovery, it wasn't an

22 exception to FRCP 26.  It's just that when you do discovery,

23 here's the deadlines and, parentheses, make sure you comply

24 with the Federal Rules of Civil Procedure and Rule 26 in the

25 interim.

32

1          THE COURT:  Yeah, it's my order.  I know what it

2    means.  When I set a discovery deadline, I meant you can

3    conduct discovery.  That's what I meant.

4          MR. COHEN:  I understand.  Okay.  Thank you very

5    much.

6          THE COURT:  And just so the record is clear, Rule

7    26(d)(1) specifically says without initial disclosure, you

8    can't conduct discovery unless authorized by these rules by

9    stipulation or by court order.

10          MR. COHEN:  I've actually looked into that.  And

11   it has been my experience that there are opportunities to do

12   expedited discovery without doing initial disclosures first,

13   if there's an emergency, exigent circumstance.  That was

14   what I understood that clause meant.

15          THE COURT:  I entered an order.  What I meant is,

16   when I set a discovery deadline, you're free to do

17   discovery.

18          And the other thing is, the case law on failure to

19   do initial disclosure, if you look at the cases, the courts

20   are very sympathetic to the party who attempted to do their

21   initial disclosure but the other side didn't.

22          Here, both parties didn't do it.  So it's hard for

23   me to say, since both sides did not conduct initial

24   disclosure, that one side should be sort of paralyzed by the

25   rules when the other side also failed to do it.

33

1        MR. COHEN:  I understand.

2        THE COURT:  Thank you everyone for being here.

3        MR. COHEN:  Thank you.

4        THE COURT:  This is not the hearing that I thought

5 I was going to have today.  But it is what it is, and

6 hopefully this matters settles.  If not, I'll see everyone

7 back here November 18th at 10:30 a.m.

8        MR. POLIS:  Thank you.

9        THE COURT:  Thank you.

10        MR. COHEN:  Since this is the Jewish New Year,

11 Happy New Year to your Honor.

12        THE COURT:  Happy New Year.

13        MR. COHEN:  Thank you.

14        THE COURT:  All right.  That concludes the Court's

15 10:00 a.m. hearing.  We can go off the record.

16     (Proceedings concluded.)

17

18        I certify that the foregoing is a correct

19 transcript from the electronic sound recording of the

20 proceedings in the above-entitled matter.

21

22 /s/ Holly Steinhauer_____        9-29-21_____
Transcriber                Date

23

24

25

**EXHIBIT "2"**

Law Office of
# Baruch C. Cohen, Esq.

---

4929 Wilshire Boulevard, Suite 940
Los Angeles, California 90010-3823
Email: baruchcohen@baruchcohenesq.com

Telephone: (323) 937-4501
Facsimile:(888) 316-6107
bcc4929@gmail.com

September 10, 2021

**_Email: sanaz@berelianilaw.com_**

Sanaz Sarah Bereliani, Esq.
Bereliani Law Firm
12100 Wilshire Blvd 8th Floor
Los Angeles, CA 90025

Re:    **Adversary case 6:18-ap-01193. Karl T. Anderson against Nicholas Silao - Results of
Hearing on Motion to Allow Withdrawal of Deemed Admissions FRCP 36(B)**

Dear Ms. Bereliani:

Yesterday I appeared in person at the 10:00am hearing on Mr. Silao's *Motion to Allow
Withdrawal of Deemed Admissions FRCP 36(B)*. Unfortunately, you did not appear, as you
emailed me 2 minutes before the hearing at 9:58am, that you could not appear (even though you
signed stipulations continuing the hearing to today and promised that you would appear).
To say the Court was displeased with you is an understatement.

I am pleased to report, that after oral arguments were made, the Court **granted** Mr. Silao's
Motion and withdrew the deemed admissions. That's the good news.  **However**, the bad news is
that the Court conditioned the granting of the Motion on you and Mr. Silao being jointly and
severally liable for the Trustee's fees and costs (which the Trustee said was $22,000.00). As the
Court had no evidence before him of the Trustee's actual fees and invited the parties to brief it
with detailed billing details. The briefing schedule on the Trustee's fees is:

9-24-2021 - The Trustee's Brief on his fees is due;
10-15-2021 - Oppositions by you and Mr. Silao is due on the Trustee's Fees; &
11-18-2021 at 10:30am - Telephonic Hearing on the  Trustee's Fees.

I argued against Mr. Silao being (jointly and severally) liable with you for the Trustee's fees and
costs, because according to Mr. Silao the fault for this debacle lies solely with you in not
providing Mr. Silao with the Trustee's RFA's that caused him not to respond and default.

The Court then adjusted his ruling and said that if before the 11-18-2021 hearing on the Trustee's
Brief, you "fall on your sword" and sign a declaration under penalty of perjury making a
definitive statement (with no ambiguities) taking full responsibility that you are solely at fault (in
the spirit of CCP §473(b) and CCP §473(c)(2) which the Court recognized is not controlling law
in Federal Bankruptcy practice), and will pay the Trustee's fees, he might reconsider his
apportionment of who is to pay the Trustee's fees, and might reapportion all or more to you.

Page 1 of  2

Accordingly, Mr. Silao requests - in the strongest of terms - that you comply with the Court's directives so that Mr. Silao not have to pay the Trustee's fees and costs. Please advise by close of business on **Monday 9-13-2021 at 5:00pm,** whether you will comply.

If you have any questions or comments regarding the above, please do not hesitate to call.

Respectfully,

*Baruch Cohen*

BARUCH C. COHEN
cc:      Nicholas Silao

D:\DATA\DOCS\SILAO\BERELIANI-2.wpd
9/10-1:07pm

Page 2 of  2

**EXHIBIT "3"**



BARUCH COHEN <baruchcohen@baruchcohenesq.com>

---

### Re: Adversary case 6:18-ap-01193. Karl T. Anderson against Nicholas Silao - Results of Hearing on Motion to Allow Withdrawal of Deemed Admissions FRCP 36(B)

**Sanaz Sarah Bereliani** <sanaz@berelianilaw.com>                    Fri, Sep 10, 2021 at 1:23 PM
To: bcc@baruchcohenesq.com, Chris Ugarteche <chris@berelianilaw.com>, Tom Polis <tom@polis-law.com>
Cc: BARUCH COHEN <baruchcohen@baruchcohenesq.com>

Mr. Cohen,

I am happy to provide a declaration to the court of what I was to testify yesterday. To say that you have thrown me under the bus for no reason to save your client is not something I expected of a Rabbi, who is supposed to be ethical. That is an understatement.

The fact that I did not show yesterday was simply due to the emergency I was going through and lack of ability to communicate sooner. I was not at disneyland or CAALA like some other people. My mother has dementia alzheimers, when she has a fall and caregivers go missing and I am the one in charge of everything while living in a hotel because my hot water pipe burst and flooded my home, I think it is human for something in my position to lose track of time and day because I'm dealing with my mothers well being. My fault yesterday was not being able to communicate with the Court that I had an emergency and needed a continuance. If you were to follow my track record as an attorney and officer of the court you'll see I've NEVER been sanctioned and I am a very respected attorney.

I appreciate you emailing me the status from yesterday, however, I do not see a reason to take blame for something I am not responsible for three years ago. Please remind your client that he fell silent and disappeared and evaded the court and his then attorney - me.

Very interesting that all these things are happening between Rosh and Kippur and my first bad experience in bankruptcy court is with a Rabbi, definitely did not see that coming.

I will be responsive to the Court accordingly.

[Quoted text hidden]
--
-- Sanaz Sarah Bereliani, Esq. // Direct: 310-882-6258

**EXHIBIT "4"**

Law Office of

# Baruch C. Cohen, Esq.

---

4929 Wilshire Boulevard, Suite 940                                    Telephone: (323) 937-4501
Los Angeles, California 90010-3823                                    Facsimile:(888) 316-6107
Email: baruchcohen@baruchcohenesq.com                                 bcc4929@gmail.com

September 11, 2021

***Email: sanaz@berelianilaw.com***

Sanaz Sarah Bereliani, Esq.
Bereliani Law Firm
12100 Wilshire Blvd 8th Floor
Los Angeles, CA 90025

Re:     **Adversary case 6:18-ap-01193. Karl T. Anderson against Nicholas Silao - Results of
        Hearing on Motion to Allow Withdrawal of Deemed Admissions FRCP 36(B)**

Dear Ms. Bereliani:

You might want to seriously reconsider your position - not to take full responsibility for Mr.
Silao's failure to respond to the Plaintiff's RFA's - once you read the Court's transcript of the
hearing.

Judge Yun commented that while you have general bankruptcy cases before him, you have
virtually no adversary cases before him, and actually recommended - from the bench - that Mr.
Silao consider suing you for malpractice. Perhaps a State Bar complaint will be filed, but that has
yet to be determined.

Contrary to your 10-15-2018 retainer agreement you did not notify Mr. Silao of "each step of the
process" as you did not even notify Mr. Silao of the Plaintiff's RFA's which were served on you
on 3-7-2019.

In your 10-31-2018 Answer to the Trustee's Complaint you asserted a 2nd Affirmative Defense
that "*Plaintiff has Insufficient Evidence To Establish Their Case*." On what basis did you assert
that Plaintiff has insufficient evidence to establish his case? What inquiry did you make with Mr.
Silao under FRCP 11(b) to make that claim?

In your 10-31-2018 Answer to the Trustee's Complaint you asserted a 4th Affirmative Defense
that "*even if the Plaintiff had a legitimate claim against the Defendant, that claim is excepted
from turnover to the extent that such debt may be offset under 11 U.S.C. § 553*." On what did you
base your assertion that even if the Plaintiff had a legitimate claim against Mr. Silao, that claim is
excepted from turnover to the extent that such debt may be offset under 11 USC 553? What
inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

On 1-2-2019, notwithstanding your limited scope of retention to *only* file an Answer, you
subsequently participated in filing a Joint Status Report (pursuant to LBR 7016-1(a)(1) as the one
attorney responsible for trying the case or the attorney who is responsible for preparing the case

Page 1 of  4

for trial), wherein you responded to Question # B3 (Readiness for Trial), that you expect to complete Mr. Silao's discovery by May 2019. On 1-17-2019, you had Michael Smith your special appearance attorney cover for you at the Status Conference where the Court set the discovery cutoff date by 6-28-2019. Therefore, Judge Yun stated that you certainly knew that discovery would be propounded.

Further evidence that you knew that discovery would be propounded is:

In the 1-2-2019, Joint Status Report you responded to Question # B2 (Readiness for Trial), that Mr. Silao's reason for being ready for trial in July 2019 was because he intended to propound discovery and attend mediation. On what did you base your assertion that Mr. Silao intended to propound discovery and attend mediation? Did you discuss this with Mr. Silao in writing? Did Mr. Silao authorize you to pursue mediation? did you have MR. SILAO execute pursuant to California Evidence Code §1129 *Mediation Disclosure Notification and Acknowledgment?* What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # B3 (Readiness for Trial), that Mr. Silao expects to complete his discovery by May 2019. On what did you base your assertion that Mr. Silao would expect to complete his discovery by May 2019? Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # B1 (Readiness for Trial), that Mr. Silao would be ready for trial in July 2019? On what did you base your assertion that Mr. Silao would be ready for trial in July 2019? Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # C1 (Trial Time), that Mr. Silao's estimate of trial would be 1 court day. On what did you base your assertion that Mr. Silao would need 1 court day for trial? Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # D (Pre-Trial Conference), that Mr. Silao requested a pretrial conference after 5-31-2019. Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # E (Settlement), that Mr. Silao requested that this case be mediated. Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

In the 1-2-2019, Joint Status Report you responded to Question # F (Final Judgment Order), that Mr. Silao consented to this Court's jurisdiction. Did you discuss this with Mr. Silao in writing? What inquiry did you make with Mr. Silao under FRCP 11(b) to make that claim?

On 2-6-2019, you wrote Mr. Silao that you were no longer retained to represent him further after you filed the Answer for him, and that if he did not substitute you out immediately, you will be forced to withdraw, and on 2-11-2019, you sent him a Substitution of Attorney. I believe I recall Judge Yun speculating that you probably waited and scrambled to move to withdraw on 3-15-2019, 1-week after you received Plaintiff's RFA's to avoid having to respond to them.

And then on 8-7-2019, you sent me only 12 documents and specifically, you did not send me the Trustee's RFA's that were served on you on 3-7-2019, in violation of the California Rule of

Professional Responsibility 4-100(B).

And then, to add to your confusion, on 9-17-2019, you sent me your declaration in support of the Motion. ¶¶ 4-6 claiming that after your representation ended when you filed your answer, in 1-2019, you were then "retained for the purpose of filing a Joint Status Report and an appearance at the Joint Status Conference." The problem with your claim, is that there is no evidence in your file, that you were formally retained to handle the Joint Status Report and the Status Conference.

The record is pretty clear, that the fault for this debacle lies solely with you in not providing Mr. Silao with the Trustee's RFA's that caused him not to respond and default.

As the Court said at the last pretrial hearing on 1-17-2020,

> THE COURT: And, you know, I'm obviously not going to request, Mr. Cohen, that you pay this, because you inherited this mess. But the person who is really at fault here is the Defendant's former counsel. And I've got to tell you. This -- the reason why I'm saying, when we come back here we're going to try to resolve that dispute, I really want to see that person in this courtroom face to face. On paper, I don't believe her. On paper, I think she just did a horrible job. She abandoned the client when the client said, I want to hire a new attorney. I just don't believe her based on the story I've seen on paper. That's why I want to see her in this courtroom.

[Transcript, p.7, lines 16-25, p.8, lines 1-3].

> MR. COHEN: To what extent do you, your Honor, need my client present? My client lives in New York.

> THE COURT: Yeah. I do not. I don't really need him here. I think -- unless there's something I haven't seen yet.

> MR. COHEN: His declaration says he didn't receive anything from --

> THE COURT: Right.

> MR. COHEN: -- Bereliani's office.

> THE COURT: Right. That part I find credible. I think this all comes down to Ms. Bereliani, and whether I believe her. ***And, ultimately, even if she falls on the sword and says it's all her fault, okay, there's going to be a consequence for her, in order to help her former client get over this hurdle.*** I am a true believer that if you give litigants, attorneys, parties, my children, anybody a free pass, a mulligan, they never learn any lesson. My kids know this. There's always a penance, a consequence, a cost for daddy's forgiveness. ***A price has to be paid.*** Then they learn. It never happens again. ***If I give Ms. Bereliani, even if she comes, she cries, she falls on the sword, it's all her fault, it's not the client's fault, there's going to be a price for that, so that she learns to never do that again.*** So, good luck to both of you, and one way or another we're going to move forward with this adversary proceeding. [Emphasis added].

[Transcript, p. 20, lines 24-25, p.21, lines 1-25, p. 22, lines 1-25, p.23, lines 1-13].

The Motion was not about "throwing you under the bus" and has absolutely nothing to do with my being an ethical person or rabbi, or whether Judge Yun's comments at the hearing occurred between Rosh Hashana and Yom Kippur. I wrote you my earlier letter to give you an opportunity to prevent Mr. Silao from having to pay the Trustee's $22,000.00, and purposely did not copy Plaintiff's counsel Tom Polis, so that you could save face. You, however, copied Mr. Polis with your response which was of your own doing and unfortunate.

In no way am I insensitive to your mother's plight. On the contrary, I am extremely sensitive to her plight and to yours as her caregiver, as my mother died tragically from dementia alzheimers, so I am acutely aware of the pain. Judge Yun stated on the record that he was informed by his clerk of your unavailability, yet proceeded with the hearing without you, and made his comments about you nevertheless.

Again, Mr. Silao requests - in the strongest of terms - that you reconsider your position and do the right thing to prevent him from paying the Trustee's fees and costs. Doing so will certainly impact heavily on Mr. Silao's decision to sue you and/or report you the State Bar. Again, please advise by close of business on **Tuesday 9-14-2021 at 5:00pm,** whether you will comply.

If you have any questions or comments regarding the above, please do not hesitate to call.


Respectfully,

*Baruch Cohen*

BARUCH C. COHEN
cc:      Nicholas Silao
D:\DATA\DOCS\SILAO\BERELIANI-3.wpd
9/11-9:38pm

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

4929 Wilshire Boulevard, Suite 940, Los Angeles, California 90010.

A true and correct copy of the foregoing document entitled: **DEFENDANT'S OBJECTION TO THE REASONABLENESS OF PLAINTIFF'S ATTORNEY FEES; DECLARATION OF BARUCH C. COHEN AND NICHOLAS SILAO** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On 10/11/2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Baruch C Cohen            bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
Sanaz Sarah Bereliani     Sanaz Bereliani berelianilaw@gmail.com, chris@berelianilaw.com; r48595@notify.bestcase.com
Karl T Anderson (TR)      2edansie@gmail.com, kanderson@ecf.axosfs.com
Thomas J Polis            tom@polis-law.com, paralegal@polis-law.com; r59042@notify.bestcase.com
US Trustee                ustpregion16.rs.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On 10/11/2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 10/11/2021,, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Hon. Scott H. Yun, USBC, Central District of California, 3420 Twelfth Street, Suite 345, Riverside CA 92501

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/11/2021 | Baruch C. Cohen, Esq. | /s/ Baruch C. Cohen |
|---|---|---|
| _Date_ | _Printed Name_ | _Signature_ |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.