Sanaz S. Bereliani, SBN 256465
**Bereliani Law Firm, PC**
12100 Wilshire Blvd, Suite 800
Los Angeles, CA 90025
Telephone: 310-882-5482
Fax: 888-876-0896
E-mail: sanaz@berelianilaw.com

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION

| | |
|---|---|
| In re: | BK Case No.:  6:17-bk-19336-SY |
| PANDORA HOSPICE CARE, INC | Adv. Case No.: 6:18-ap-01193-SY |
| Debtor. | Chapter 7 |
| | **OBJECTION TO DECLARATION OF THOMAS J. POLIS RE: POLIS & ASSOCIATES' FEES ORDERED TO BE PAID BY THE COURT REGARDING THE REQUEST FOR ADMISSIONS DISPUTE ONLY; DECLARATION OF SANAZ BERELIANI IN SUPPORT THEREOF** |
| KARL T. ANDERSON, CH 7 TRUSTEE, | |
| Plaintiff | |
| vs. | |
| NICHOLAS SILAO, | |
| Defendant. | Hearing: |
| | Date:    November 18, 2021 |
| | Time:    10:30am |
| | Ctrm:    302, 3rd Floor |
| | 3420 Twelfth Street |

**TO THE HONORABLE SCOTT H. YUN, UNITED STATES BANKRUPTCY JUDGE;**

**KARL T. ANDERSON, CH 7 TRUSTEE AND HIS ATTORNEYS POLIS & ASSOCIATES;**

**DEFENDANT NICHOLAS SILAO AND HIS CURRENT COUNSEL OF RECORD; AND ALL**

**OTHER INTERESTED PARTIES:**

//

//

//

1

## 1. INTRODUCTION

This case revolves around an adversary complaint filed by the Trustee, Karl T. Anderson, under 11 U.S.C. §542 for the turnover of $137,000 to the Debtor's estate.  Attorney, Sanaz Bereliani, represented Defendant, Nicholas Silao, briefly on a limited scope basis to file an answer to the complaint and to prepare the joint status report and attend the hearing on same. Mr. Silao paid Ms. Bereliani $1,442.50 for this work.  Ultimately, Ms. Bereliani was forced to file a motion to withdraw from the case because Mr. Silao would not respond to her emails or phone calls.  Ms. Bereliani represented Mr. Silao from October 31, 2018 (when she filed the answer to the complaint) until April 16, 2019 (when the withdrawal order was filed with the court).  During the time Ms. Bereliani was still counsel of record, the Trustee allegedly served a set of Request for Admissions ("RFAs") which Ms. Bereliani never received.  Subsequently, unbeknownst to Ms. Bereliani, the admissions were deemed admitted by the Court for Mr. Silao's failure to respond.

On August 12, 2019, Baruch Cohen substituted in as the Defendant's new counsel. Mr. Cohen has represented Mr. Silao for more than two years now and has had many opportunities to settle this matter with the Trustee, but instead has elected a strategy to vigorously litigate this action thereby charging Mr. Silao an excessive amount of attorney's fees, which could have been used to settle this matter.  Moreover, because of Mr. Cohen's errors in filing a motion to withdraw the deemed admissions (ultimately, he had to file the motion three separate times), the Trustee incurred attorney's fees that should not be attributed to Ms. Bereliani.

On September 9, 2021, a hearing was held in this matter to deem the admissions to the RFAs be withdrawn.  The Court held that both Mr. Silao and Ms. Bereliani should be jointly responsible for compensating the bankruptcy estate the attorney's fees it has incurred as a result of the discovery dispute relating to the RFAs only.  [See transcript of hearing attached as **Exhibit A** hereto pg. 17:21-24 & 19: 2-5]

\ \ \

\ \ \

\ \ \

**OBJECTION TO DECLARATION OF THOMAS J. POLIS RE: POLIS & ASSOCIATES' FEES ORDERED TO BE PAID BY THE COURT REGARDING THE REQUEST FOR ADMISSIONS DISPUTE ONLY; DECLARATION OF SANAZ BERELIANI**

## 2.  POLIS & ASSOCIATES' FEES THAT SHOULD BE DEDUCTED FROM THEIR BILLING AS THEY DO NOT RELATE TO THE RFA DISCOVERY DISPUTE.

In reviewing Polis & Associates billing submitted with Mr. Polis declaration, there is approximately $4,037.50 in fees that appear not to be associated with the RFA discovery dispute. These entries are as follows:

| Date | Description of Work | Fee |
|------|---------------------|-----|
| 7.30.2019 | Preparation of letter to N. Silao re: joint pre-trial stipulation upcoming pre-trial conference; non-responsive discovery issues. | $142.50 |
| 8.8.2019 | Preparation of unilateral pre-trial stipulation; declaration in support of unilateral trial stipulation. | $570.00 |
| 8.12.2019 | Review and analyze N. Silao's unilateral pre-trial stipulation. | $142.50 |
| 8.12.2019 | Review and analyze N. Silao's pre-trial declaration. | $142.50 |
| 9.4.2019 | Review complex email from Baruch Cohen re: meet and confer re: joint pre-trial stipulation; proposed motion in limine | $95.00[1] |
| 9.10.2019 | Preparation of continued notice of hearing re: pre-trial conference. | $142.50 |
| 9.11.2019 | Telephone conference with chapter 7 trustee re: status issue | $142.50 |
| 9.11.2019 | Review and analyze email from Baruch Cohen re: "meet and confer" | $95.00 |
| 9.11.2019 | Preparation of email to Baruch Cohen re "meet and confer". | $142.50 |
| 11.27.2019 | Review and analyze email from Baruch Cohen re: proposed joint stipulation; meet and confer. | $95.00[2] |
| 12.5.2019 | Preparation of email to Baruch Cohen re: scheduling "meet and confer" | $95.00 |
| 12.5.2019 | Telephone conference with Baruch Cohen re: meet and confer. | $95.00 |

[1]  A deduction of .1 hours (or $47.50) was taken off this entry for email review relating to motion to withdraw deeded admissions.
[2]  A deduction of .1 hours (or $47.50) was taken off this entry for email review relating to motion to withdraw deeded admissions.

| 12.13.2019 | Review and analyze email from Baruch Cohen re: follow up to meet and confer. | $95.00 |
| 12.16.2019 | Review and analyze email from Baruch Cohen re: draft joint pre-trial stipulation. | $332.50 |
| 1.2.2020 | Preparation of email to Baruch Cohen requesting removal of the incorrect joint pre-trial stipulation. | $95.00 |
| 1.9.2020 | Review and analyze email from Baruch Cohen re: correct changes to the joint pre-trial stipulation; preparation of email to Baruch Cohen re: same. | $95.00 |
| 1.10.2020 | Preparation of unilateral pre-trial stipulation | $332.50 |
| 1.13.2020 | Review and analyze N. Silao's unilateral pre-trial stipulation | $142.00[3] |
| 1.22.2020 | Telephone conference with chapter 7 trustee re: overall settlement issues. | $142.50 |
| 1.22.2020 | Preparation of email to Baruch Cohen re: settlement offer | $142.50 |
| 1.23.2020 | Preparation of email to Baruch Cohen re: additional settlement offer. | $142.50 |
| 1.27.2020 | Preparation of 2nd notice to continue pre-trial conference. | $95.00 |
| 2.26.2020 | Telephone conference with chapter 7 trustee re: status of settlement | $142.50 |
| 2.26.2020 | Preparation of email to Baruch Cohen re: trustee's settlement offer; trustee's attorney's fees to be reimbursed. | $142.50 |
| 2.26.2020 | Review and analyze email from Baruch Cohen re: trustee's $50,000 settlement offer. | $142.50 |
| 6.17.2020 | Review and analyze order rescheduling continued pre-trial conference. | $95.00 _____ |
| | **Total Fees to be Deducted from Trustee's Billing:** | **$4,037.50** |

---

[3] A deduction of .3 (or $142.50) was taken off this entry for review of reply to trustee's opposition to motion to withdraw deemed admissions (2nd).

4

Besides the above fees, which are unrelated to the RFA discovery dispute, Mr. Polis has a time entry on August 9, 2019 that states: "Telephone conference with chapter 7 trustee re: RFAs issue." He has billed almost 4 hours for this call (3.7 hours) at a cost of $1,757.50. There were only 9 requests and they were not complicated. This time seems excessive for the task described and Ms. Bereliani requests that this amount be reduced by half.

Based on the above Polis & Associates attorney's fees invoice should be reduced to $14,867.50.

### 3.  DEFENDANT NICHOLAS SILAO SHOULD BE APPORTIONED TO PAY MORE OF THE TRUSTEE'S ATTORNEY'S FEES AS HIS STRATEGY WAS TO VIGOROUSLY LITIGATE THIS MATTER RESULTING IN EXCESSIVE AMOUNTS SPENT ON ATTORNEY'S FEES TO MR. COHEN WHEN THE PRUDENT AND EFFICIENT STRATEGY WOULD HAVE BEEN TO USE HIS MONEY SETTLE THIS MATTER.

While Ms. Bereliani believes she should not be sanctioned in this matter by paying half of the Trustee's attorney's fees relating to the RFA dispute simply because she could not appear in person at the hearing on September 9, 2021 for a legitimate medical reason, should the Court make a final determination that this will be the order on the subject motion, Ms. Bereliani argues that the Court should apportion a majority of the fees to be paid by the Defendant.

Mr. Cohen substituted in this case as Defendant's counsel on August 12, 2019 and has remained as Defendant's counsel for more than two (2) years. Based on Mr. Polis' billing records, during the time that Mr. Cohen became involved in the case to the date of the September 9, 2021 hearing, Mr. Polis incurred $16,435.00 in attorney's fees.[4] If Mr. Polis incurred more than $16,000 in fees, Mr. Cohen presumably incurred substantially more fees than this as, according to Mr. Polis' records, he prepared several complex emails to Mr. Polis; prepared an extensive motion to allow withdrawal of deemed admissions which was rejected sua sponte by the court as it was incorrectly prepared and filed; prepared two more amended motions to allow withdrawal of deemed admissions after the first motion

---

[4]  This amount was derived by subtracting the first three billing items (7/30/2019, 8/8/2019 and 8/9/2019) from the total amount of fees in the bill, $18,905.  Mr. Cohen appears to have started working on the matter around August 9, 2019 when he prepared and sent an email to Mr. Polis.

1    was rejected by the court; prepared a reply brief to the opposition to the motion; prepared numerous

2    meet and confer emails; had numerous settlement communications; and worked on numerous versions

3    of pre-trial stipulations.

4          With respect to the duplicate (amended) motions relating to the withdrawal of deemed

5    admissions, Ms. Bereliani argues that she should not be ordered to pay for Mr. Cohen's mistakes with

6    respect to these motions.  Clearly, Mr. Cohen erred in filing these documents, which blame should not

7    be placed on Ms. Bereliani.  The following entries on Mr. Polis' billing record should be apportioned to

8    Mr. Silao alone:

| Date | Description of Work | Fee |
|---|---|---|
| 11.27.2019 | Telephone conference with chapter 7 trustee re: court's sua sponte denial of Request for Admission motion | $95.00 |
| 1.2.2020 | Review and analyze and preparation of stipulation with Baruch Cohen re: withdrawal of motion to allow deemed admissions | $142.50 |
| 1.9.2020 | Preparation of opposition to N. Silao's 2nd motion to allow withdrawal of deemed admissions | $617.50 |
| 1.13.2020 | Review and analyze N. Silao's unilateral pre-trial stipulation and review N. Silao's reply to trustee's opposition to motion to withdraw deemed admissions (2nd) | $285.00 |
| 1.22.2020 | Review and analyze N. Silao's amended motion to allow withdrawal of deemed admissions | $570.00 |
| 2.25.2020 | Review and analyze N. Silao's 3rd amended motion to allow withdrawal of deemed admissions | $332.50 |
| 3.11.2020 | Preparation of opposition to vacate Request for Admission motion | $665.00 |
| 3.12.2020 | Preparation of trustee's opposition to N. Silao's 3rd motion to allow withdrawal of deemed admissions; evidentiary objections to the depositions of B. Cohen, N. Silao and S. Bereliani | $617.50 |
| 9.7.2021 | Preparation of proposed settlement agreement to B. Cohen re: defendant's motion to withdraw deemed admissions | $142.50 |
| | **Total Fees** | **$3,467.50** |

      The fees above, $3,467.00, should be paid by Defendant and deducted from the reduced fees of

Polis & Associates.  The reduced fees are those fees that relate only to the RFA discovery dispute.  The

remaining amount of fees owed would then be apportioned according to the Court's discretion.

**OBJECTION TO DECLARATION OF THOMAS J. POLIS RE: POLIS & ASSOCIATES' FEES ORDERED TO
BE PAID BY THE COURT REGARDING THE REQUEST FOR ADMISSIONS DISPUTE ONLY;
DECLARATION OF SANAZ BERELIANI**

Based on Mr. Polis' billing records, for more than two (2) years, Mr. Cohen elected to litigate this action and clearly saw it has a billing opportunity for himself.  Based on the fees charged by Mr. Polis, Mr. Cohen's fees were probably twice as much.  Mr. Polis' billing records indicate that he had a conference, more than once, with the Trustee about an overall settlement (see billing entry on 1/22/2020) with Mr. Silao in the amount of $50,000.00.  This would seem to be a reasonable settlement, which Mr. Cohen should have advocated his client take as a prudent strategy in this matter.  Instead, it appears that the money was consumed by Mr. Cohen's insatiable litigation strategy.

Indeed the Court is in agreement with the prudent strategy of settling this matter.  At the September 9, 2021 hearing, Judge Yun stated that he was really surprised as to why this matter has not settled. [See transcript of hearing (attached as Exhibit A) 30:18-19 & 25:23-24].  In addition, Judge Yun stated: "But I can't imagine paying attorneys' fees, taking time off work, flying out to California for a trial makes financial sense for Mr. Silao." [Transcript 27:24-28:2].

### 4.  CONCLUSION

Ms. Bereliani respectfully requests that the Court reconsider its position in ordering that she pay the Trustee's attorney's fees in this matter.  But for a serious medical condition suffered by her mother and her caretaker responsibilities, it was impossible for her to reach the Court in time to personally appear for the hearing.  Ms. Bereliani plans to appear personally at the November 18, 2021 to advocate her position.  However, if the Court does not reconsider its order, Ms. Bereliani respectfully requests that the Court issue a lower apportionment of payment of the Trustee's fees based on the arguments herein.

Dated: October 13, 2021                                        _____

SANAZ S. BERELIANI

7

## DECLARATION OF SANAZ SARAH BERELIANI

I, Sanaz Sarah Bereliani, hereby declare as follows:

1.    I am the former attorney for Defendant/Debtor, Nicholas Silao ("Defendant"), in the within adversary action filed in the Debtor's Chapter 7 bankruptcy case.  I am admitted to practice law before this Court and all Courts in California as a California Bar Bankruptcy Specialist and am a member in good standing.  If called upon as a witness I could and would testify competently to the within matters which are of my own personal knowledge.   I make this declaration in support of my objection to the declaration of Thomas J. Polis regarding Polis & Associates' fees ordered to be paid by the court regarding the request for admissions dispute only.

2.    First, I do sincerely apologize for not appearing at the September 9th hearing even though the court had ordered (by subpoena) that I appear in person to testify that I did not receive in the mail, or otherwise, Requests for Admissions propounded on the Defendant by the Trustee during my limited representation of the Defendant from October, 2018 to April, 2019.  I certainly had every intention of appearing at the hearing on September 9th and would have appeared but for an extreme emergency with my mother who is suffering from Alzheimer's.  I did not simply fail to appear because I did not care or that I just did not feel like coming.  Law is my profession and I have the utmost respect for the legal system and the courts but it just so happens that at the time of this hearing my family had to come first because I had no one else to turn to.

3.    While not using it as an excuse to shrug off an immensely important responsibility, I would like to clarify my reasons for not appearing at the hearing on September 9, 2021.   On January 14, 2021, my father passed away after a long battle with a multitude of illnesses on top of getting COVID.  Also, at the same time, my mother was diagnosed with Alzheimer's Dementia and I was placed as my mother's caretaker, power of attorney and the trustee of the family. I have attempted to juggle all of these family functions including my mother's care.  Since my father's passing, my

mother's condition has advanced significantly to the point that she cannot eat, dress, or stay home alone without supervision.

4.      Right before the hearing, the caregiver I hired for my mother had left our employment[5] and I was left having to step in until I found coverage. I was not able to find an agency or individual to cover me in order to drive to Riverside, CA. Right before the hearing, my mother's caregiver left our employment and I was left having to step in until I found coverage. This having been dropped on me hours before the hearing, I was not able to find an agency or individual to cover me in order to drive to Riverside, CA. I emailed the Court (Shari Mason), Mr. Cohen and Mr. Polis and advised that I would not be able to make it to the hearing by 10:00 a.m. It was my sole fault that I emailed the Court and counsel so late, for which I deeply apologize.

5.      I did not hear back from anyone to my email on that day. The next day I received an email from Mr. Cohen advising me that he had received my email just a couple of minutes before the hearing began along with his recount of the proceedings. I also received an audio copy of the transcript of the hearing and it appears that the Court read my email as Judge Yun commented that I had asked if a Zoom call could be scheduled. A true and correct copy of the transcripts are attached as **Exhibit A** and incorporated by reference. While I understand completely why Judge Yun was upset that I did not appear, he also seemed to be at a loss as to how to proceed and asked counsel for their suggestions including whether or not the hearing on the matter should be continued. What bothers me is that my email referenced my mother's situation and it seems that someone, particularly Mr. Cohen, could have suggested that a continuance would have been appropriate and proper considering the matter at hand. In fact, not only did Mr. Cohen not suggest a continuance he made a knowingly false

---

[5] On the morning of September 9, my mother took a fall and her caregiver did not show up. I was the only one who could stay with her and I spent the morning prior to 10:00am trying to find someone else to care for her so I could drive to Riverside for the hearing.

argument that I had been in possession of the subject RFA's the whole time and never gave them to him.  This could not be farther from the truth.

6.      In October 2018, Defendant (and his brothers) hired me on a *limited* basis (which I will not do again in the future) to assist them with only answering the adversary complaint. After answering the complaint, the Defendant advised that his mother had passed away and that he would not be able to proceed with any activity until the family matters were resolved.  In respect of the circumstances, I reached out to Mr. Polis to advise him of delays.  At that time, I advised the Defendant (and his brothers) that a joint status report and conference deadline was coming up which he must participate in.  The Defendant further retained me to handle the joint status report and conference. Unfortunately, I was not successful in communicating with the Defendant after that.

7.      On February 11, 2019, I emailed the Defendant, advising him that because of the lack of communication and since he had not contemplated my further representation, I was not able to proceed as I could not respond on his behalf since I did not know the further facts of the case or the preferred game plan of the part(ies).  I provided him with a Substitution of Attorney to review and sign.  After not hearing back from the Defendant for a few days, I emailed him and advised that I planned on withdrawing from the case due to a breakdown in communications.  My office continued to try to contact Defendant for about a month and my last attempt to communicate with him was on March 13, 2019 when I called and left a message, but I never heard back from him.

8.      On March 15, 2019, I filed my motion to withdraw [Docket 12] as Defendant's counsel; on April 29, 2019 the Court entered its Order granting my motion to withdraw [Docket 16]; on May 1, 2019 the Court's Certificate of Notice was filed and served on Defendant via mail by the Court. At the time of the hearing on the motion, April 11, 2019, the Court and Mr. Polis requested that I provide contact information for the Defendant, which I did, so Mr. Polis could get in touch with the Defendant directly.

9.      On or about August 7, 2019 when I received an email from the Defendant, copying his new attorney Mr. Cohen, requesting a copy of his file. The same day I forwarded the Defendant an email with **my entire file which had no discovery documents** which included: (1) The Complaint; (2) Retainer Agreement; (3) A Waiver of Conflict of Interest for a Joint Representation signed by Nick Silao; (4) A Waiver of Conflict of Interest for a Joint Representation signed by Ray Silao; (5) A Paypal receipt of Nick's payment to you; (6) the Answer to the Complaint; (7) Another copy of the Answer to the Complaint; (8) the filed JSR; (9) the filed Scheduling Order; (10) a blank form Substitution of Attorney; (11) the Order Granting the Motion to Withdraw; and (12) the LOU receipt of Order Granting Motion to Withdraw.  At no time did I receive Request for Admissions from the Trustee's counsel at any time during my representation or after my representation of Defendant. Once Mr. Cohen substituted in as Defendant's counsel, I did contact Mr. Polis' office and requested a copy of the request for admissions, at which time I advised their office that I had never received them.

10.  During my representation of Defendant Silao,  I made every effort to advocate for him and to assist him but he refused to communicate with me in any substantive way about this case and how he wanted to proceed and what his goal was to finalize the matter.  It was clear to me he was not taking this case seriously.  I represented the Defendant on a limited scope basis for approximately six (6) months.  It is unfair to place any blame on me for the Defendant's own negligence in failing to communicate with his lawyer and diligently defending the case.

11.      Since becoming a member of the bar in 2008, I have represented debtors and creditors in consumer and business bankruptcies, as well as adversary actions. I have also represented Howard Ehrenberg, a bankruptcy trustee, in an adversary action and mediation in the Los Angeles division of this court.  Unfortunately, I have not had the honor of appearing in front of the Honorable Scott Yun on too many occasions as the majority of my cases have been filed in the

11

Los Angeles and San Fernando Divisions of this court.  However, I welcome the opportunity to appear in front of the Honorable Judge Yun at some point in the future so that he will understand that I am very respectful of the court system and am very experienced in bankruptcy law.

12.     I take my responsibilities as a bankruptcy lawyer very seriously and am proud of the reputation I have earned in the close-knit bankruptcy community through my representation of debtors, creditors, and interactions with Trustees and Judges at Court and James T. King Inn of Court.

13.     I am prepared to appear on November 18th, 2021 at 10:30am at the continued hearing in this matter, or any other time before or after that date, should the Court be amenable, in order to clear my name and testify in person that under penalty of perjury I did not receive the discovery that Mr. Polis alleges was served on my office.

14.     I hope that the Court will take into consideration the totality of the circumstances and my willingness to be available in person to testify at another time.  I respectfully request that the Court reconsider its order that I should be jointly and severally liable to pay the trustee's attorney's fees relating to the RFA discovery dispute.  While I am happy to pay a penalty for not appearing, I believe the amount the Court has order is excessive and unwarranted in light of the explanation set forth herein.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Date: October 13, 2021

Sanaz Sarah Bereliani, Esq.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**BERELIANI LAW FIRM, PC**
**12100 Wilshire Blvd., 8th Floor**
**Los Angeles, CA 90025**

A true and correct copy of the foregoing document entitled (*specify*):  **OBJECTION TO DECLARATION OF THOMAS J. POLIS RE:**
**POLIS & ASSOCIATES' FEES ORDERED TO BE PAID BY THE COURT REGARDING THE REQUEST FOR ADMISSIONS**
**DISPUTE ONLY; DECLARATION OF SANAZ BERELIANI IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in
chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR,
the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 13, 2021** , I checked the
CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail
Notice List to receive NEF transmission at the email addresses stated below:

- **Karl T Anderson (TR)**    2edansie@gmail.com, kanderson@ecf.axosfs.com
- **Baruch C Cohen**    bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
- **Thomas J Polis**    tom@polis-law.com, paralegal@polis-law.com;r59042@notify.bestcase.com
- **United States Trustee (RS)**    ustpregion16.rs.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On **October 13, 2021** , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary
proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and
addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours
after the document is filed.

Honorable Scott Yun
United States Bankruptcy Court
3420 Twelfth Street, Suite 345
Riverside, CA 92501

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each
person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by
personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission
and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be</u>
<u>completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 10/13/2021 | Chris Ugarteche | /s/ Chris Ugarteche |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

EXHIBIT "A"

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        --oOo--

4  In Re:                      ) Case No. 6:17-bk-19336-SY
                               )
5  PANDORA HOSPICE CARE, INC., ) Chapter 7
                               )
6          Debtor.            ) Riverside, California
   _____) Thursday, September 9, 2021
7                              ) 10:00 a.m.
   ANDERSON, CHAPTER 7         )
8  TRUSTEE,                    ) Adv. No. 6:18-ap-01193-SY
                               )
9          Plaintiff,         )
                               )
10     vs.                     )
                               )
11 SILAO,                      )
                               )
12         Defendant.         )
   _____)

13

14                          CONT'D DEFENDANT'S RENEWED
                            MOTION TO ALLOW WITHDRAWAL OF
15                          DEEMED ADMISSIONS F.R.C.P.
                            36(B)
16

17              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SCOTT H. YUN
18            UNITED STATES BANKRUPTCY JUDGE

19 APPEARANCES:

20 For the Plaintiff:           THOMAS J. POLIS, ESQ.
                                Polis & Associates, APLC
21                              340 South Farrell Drove
                                Suite A210
22                              Palm Springs, California 92262

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service

```
 1  APPEARANCES: (cont'd.)

 2  For the Defendant:          BARUCH C. COHEN, ESQ.
                                Law Office of Baruch C. Cohen,
 3                                 APLC
                                4929 Wilshire Boulevard
 4                              Suite 940
                                Los Angeles, California 90010
 5                              (323) 937-4501

 6  Court Recorder:             Shari Mason
                                United States Bankruptcy Court
 7                              3420 Twelfth Street
                                Riverside, California 92501
 8
 9  Transcriber:                Briggs Reporting Company, Inc.
                                9711 Cactus Street
10                              Suite B
                                Lakeside, California 92040
11                              (310) 410-4151

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    RIVERSIDE, CALIFORNIA THURSDAY, SEPTEMBER 9, 2021 10:00 AM

2                              --oOo--

3         (Call to order of the Court.)

4              THE COURT:  This is the Court's 10:00 a.m.

5    calendar, September 9th.  There's only one matter set for

6    hearing, Pandora Hospice Care, Chapter 7 Trustee versus

7    Silao.  This is defendant's motion to allow the withdrawal

8    of deemed admissions.

9              Let's start by getting appearances.

10             MR. COHEN:  Good morning, your Honor.  Baruch

11   Cohen representing the defendant.

12             I apologize for not having a tie, but I left the

13   office -- I left my home this morning without a tie.

14             THE COURT:  Not a problem.  Good morning, Mr.

15   Cohen.

16             MR. POLIS:  I told him I'd give him the back of my

17   tie.

18             Good morning, your Honor.  Tom Polis on behalf of

19   the trustee, Karl T. Anderson.

20             Mr. Anderson.

21             MR. ANDERSON:  Good morning, your Honor.  Karl

22   Anderson, the Chapter 7 trustee.

23             THE COURT:  Good morning, gentlemen.

24             MR. POLIS:  And also my legal assistant, Cristina

25   Allen, is here to testify to all the things we did.

1          THE COURT:  Good morning.

2          MS. ALLEN:  Good morning.

3          THE COURT:  Please, everyone be seated.

4          So I leave it up to everyone whether or not they

5   want to keep their mask on.  The minute you walk outside of

6   my courtroom, you have to put the mask back on.  In the

7   courtroom is the only place where I have any power.  I'm

8   fully vaccinated.  I feel comfortable, so I leave it up

9   to -- every person has a different view of the risk of

10  COVID-19, so I leave it up to individuals whether they want

11  to keep the mask on or not.

12         Now, I've heard from my staff.  I'm not sure how to

13  proceed today.  The person who I really, really, really

14  wanted to see in my courtroom is defendant's former counsel,

15  Ms. Bereliani.  She's not here.  I understand that she wants

16  to call in or she wanted to do it by Zoom.  Unfortunately, I

17  don't have that capability in my courtroom.

18         Each judge, some time in this coming year, we're

19  going to be allowed to have technology where we can do hybrid

20  hearings in person and via Zoom.  I don't have that yet.  I

21  hope to have that technology soon, but I don't have it in my

22  courtroom.  That's not a possibility.

23         To me, a telephonic testimony of Ms. Bereliani is

24  not going to cut it.  The only reason why this matter has

25  been continued for so long is because I really wanted to see

1  Ms. Bereliani in my courtroom on the witness stand.

2          I appreciate the fact that, Mr. Polis, you brought

3  Ms. Allen with you, but I don't think the defendant has, at

4  least in writing, a question whether or not the request for

5  admissions was served.  I don't think that's in dispute.

6          MR. COHEN:  Correct.

7          THE COURT:  So the only real thing -- I've already

8  reviewed all the pleadings.  I've reviewed it again because

9  this matter has been continued for so long.

10          The only person -- I leave it up to the parties

11  what they want to do, how they want to proceed.  But the only

12  person that I really truly want to see in my courtroom

13  testify is Ms. Bereliani.  And I am a little peeved at

14  Ms. Bereliani, who signed that stipulation -- it's not as if

15  she didn't sign it -- that she's been subpoenaed to be here.

16  Sometimes that happens when somebody's compelled to appear in

17  court via subpoena, they're not cooperative.

18          But she signed that stipulation.  She's not here.

19  And I'm sort of at a loss of how to proceed today.  We could

20  do it many different ways.  We can obviously continue this

21  for Ms. Bereliani to be here, but it's -- not too happy about

22  that.

23          I can just rule on the papers.  All the relevant

24  parties submitted a declaration, including Ms. Bereliani, and

25  I could just review it and then give you my ruling.  It

1 probably won't be today, because I have not fully formed my

2 decision because I thought we were going to have in-person

3 testimony today.

4          But let me hear from the parties.

5          Mr. Cohen, do you have any thoughts or suggestions

6 on how we should proceed today?

7          MR. COHEN:  I do.

8          THE COURT:  Okay.

9          MR. COHEN:  In reviewing the paperwork myself, I

10 caught something that I did not catch earlier in the written

11 pleadings.  And I refer to Ms. Bereliani's letter.  It's

12 Exhibit 16 to the motion.

13          THE COURT:  Okay.

14          MR. COHEN:  You know, sometimes when you highlight

15 something to the Court, you tend to focus on only what was

16 highlighted, but sometimes you fail to catch the preceding

17 sentence which has even a greater kick.

18          Your Honor, the issue here, as I said quoting the

19 Watergate case, is what did she have and what did she know

20 and when did she know it.  In Bereliani's letter, she writes

21 the following:  "I do have them since they were sent to me

22 via email per my request but not before then."

23          Now, it's a bit vague, but this was in response to

24 my letter complaining why -- you know, I didn't get -- send

25 me the RFA's if you have them.  And she says, "I do have them

1  since they were sent to me via email per my request but not

2  before then."

3           I highlighted the next sentence, that "Also we were

4  not retained for work in addition to filing an answer,

5  attending the status conference."  I focused on the second

6  sentence.

7           But here we have her own letter, that if I'm

8  reading it correctly, she is saying that she had them.  And

9  if she had them, she certainly didn't produce them to me and

10  my client when I wrote her on August -- when my client

11  demanded his file pursuant to the California Rules of

12  Professional Responsibility 4-100 that requires that an

13  attorney produce and return the whole file.

14           And when she responded on August 7, 2019, she only

15  sent me 12 documents.  The plaintiff's RFA's weren't in

16  there.

17           So I dare say -- whether she was retained on a

18  limited basis to just merely file an answer to avoid default

19  or whether she was also magically retained to handle the

20  joint status report which requires that she try the case, I

21  submit, your Honor, that her exhibits -- our Exhibit 16 where

22  she said "I do have them" -- the full sentence is that "As of

23  your substitution in the case, I do have them since they were

24  sent to me via email per my request but not before then."

25           I'm not entirely sure what that means, but I read

1  it to mean she had it.  And if she had it, she certainly

2  didn't produce it to my client.  And therefore, the motion

3  should be granted on the basis that the Court has discretion

4  to not have the self-executing nature of FRCP 36 used against

5  my client, notwithstanding the fact that plaintiff never

6  issued the initial disclosures that permit discovery to go

7  thereafter.

8          So I submit, your Honor, that even without

9  Ms. Bereliani's live testimony, I think we have enough on the

10 record for the Court to hang its hat and say, well, she

11 admits she had it, she didn't produce it.  My client signed a

12 declaration that he never received it.  He should not be

13 held -- punished for this.

14         THE COURT:  Thank you, Mr. Cohen.

15         Mr. Polis.  You can address just the procedure

16 issue of how you want to proceed today or you can just

17 respond to Mr. Cohen's argument as well.

18         MR. POLIS:  With all due respect to Mr. Cohen --

19 you know, I've been friends for many years -- I think he has

20 just basically laid out what I see as a smoking gun, so to

21 speak, in the sense that she now admits she had these RFA's.

22         And my firm, my office on behalf of Mr. Anderson,

23 proceeded as if they were received and she admits she

24 received them.  We proceeded to do everything we were

25 supposed to do, unilateral status report.  And then Mr. Cohen

1  comes in.  So -- and again, we have a situation where -- and

2  I appreciate this sort of smoking gun that Mr. Cohen is

3  focused on for the Court.

4         And I think at this point, the Court has to deny

5  the motion.  And if the Court, on the other hand, is inclined

6  to grant the motion, at a minimum my firm's fees on behalf of

7  Mr. Anderson -- which we've put in a declaration -- need to

8  be part of any order that in any way rescinds the deemed

9  admissions.  And where that money comes from is between Mr.

10 Silao and Ms. Bereliani.

11        And one other final point that I was going to

12 address without even knowing about this development, is not

13 only did Mr. Silao not respond to or address the RFA's which

14 were in March of 2019, three months later -- and we have it

15 in a declaration -- my office contacted him.  He wasn't

16 represented by counsel yet.  We contacted him at the phone

17 number on the docket.  I called him.  That's in my

18 declaration.

19        We sent a FedEx to the -- I remember it very

20 clearly, 24 Central Park South -- very nice neighborhood --

21 the unilateral status report.  He didn't respond to that.

22 And then a few days later, Mr. Cohen comes in.

23        So this kind of "Oops, I didn't respond to the

24 RFA's," this wasn't just a one-time strike.  He had many

25 strikes.  And I know the Court has a lot of discretion.  I

1 know that the Ninth Circuit is clear, we want to try matters

2 on their merits.  But in a case like this where now it

3 appears there's an admission that his former counsel had the

4 RFA's, they chose not to respond and then chose not to

5 participate in the joint status report process -- he

6 obviously didn't care about this until somebody read that it

7 was -- that was really happening here -- or actually cared

8 what was happening, that this was serious money the trustee

9 was going after.

10       And one other final point I think Mr. Cohen

11 referenced in his papers as far as likelihood of success on

12 the merits is the tax return that we refer to.  And as your

13 Honor is well aware, Mr. Anderson as a trustee is also an

14 accountant, that the 2016 tax return, the last return we had

15 before this case was filed, shows $137,000 loan payable by

16 an insider, Mr. Silao, to this corporate entity.

17       So -- and his two brothers, who as the Court may

18 recall, now, whenever, a year, almost two years ago, we

19 obtained judgments against and they paid and settled it,

20 settled both of those.

21       But in this case, the combined fact of the tax

22 return, which everyone now wants to disavow -- which we see

23 constantly in bankruptcy cases, "Oh, I didn't really mean

24 that" -- combined with the fact that Mr. Silao now -- former

25 counsel admits to having the RFA's and failed to participate

1 in the process -- he didn't care.

2          Well, we cared.  He had his chance.  And we would
3 ask the Court to deny the motion.

4          THE COURT:  It's sort of beyond the scope of
5 what's here today, but I did prepare for today -- read the
6 complaint, read the answer, read the entire docket, all the
7 relevant things that happened in this case.  Who signed that
8 tax return?

9          MR. POLIS:  Mr. Silao -- well, I was looking at it
10 just the other day, your Honor.  The version that was
11 provided to us by the corporate debtor's counsel -- a big
12 law firm, I can't remember the name now.  They produced 1100
13 pages of documents, because they were all Bates stamped and
14 what you would see from a big firm.

15          THE COURT:  I think it was Keith Owens who does a
16 lot of healthcare.

17          MR. POLIS:  Yes, yes.  The 2016 tax return has a
18 signature block for Nicholas Silao.  It's not signed.  We
19 don't usually get, it seems like, signed tax returns,
20 because I don't know who signs tax returns anymore.  They're
21 all filed electronically.

22          THE COURT:  Right.

23          MR. POLIS:  But Mr. Silao, Nicholas Silao, this
24 defendant, signed that tax return.  Very good point, your
25 Honor.

1      THE COURT:  It's sort of beyond the scope of

2  today's hearing, but I was curious because I -- I haven't

3  heard anyone -- neither side has argued for a continuance to

4  have Ms. Bereliani, defendant's former counsel, here.  So I

5  am going to proceed today and rule, but I do want to hear

6  from Mr. Cohen again, so Mr. Polis, you can sit.

7      One of the things I want to hear from you --

8  whatever else you were going to say, one of the things that

9  I want to hear from you -- and a lot of this predates your

10  involvement.  And I'm glad eventually your client hired you.

11  That was always the problem of your current client -- his

12  two brothers' conduct in this case, in the adversary

13  proceedings.

14      They sort of had this cavalier attitude about

15  these lawsuits, and I think for a while they were -- not

16  just Ms. Bereliani.  There was another attorney, Christopher

17  Prince, who I know very well, who I think the other two

18  brothers were consulting but they refused to hire him as

19  counsel of record and they were only trying to limit his

20  involvement to settle.  And there was a hearing where all

21  three brothers were in my courtroom, and I really admonished

22  that conduct.

23      Attorneys are in or out.  But trying to hire

24  attorneys the way they wanted to manage it just didn't make

25  any sense, and it eventually got the two other brothers --

1  not your client, the other brothers -- in trouble because

2  they eventually faced default situations and they were

3  behind the 8-ball.  And not surprisingly, they settled and

4  they're out of the adversaries now.

5          I'm now looking at your client's conduct with his

6  prior counsel where he basically tried to do the same thing

7  that his brother did with Christopher Prince.  And this mess

8  that he finds himself in, he's culpable.

9          Ultimately, Ms. Bereliani should have done more.

10 She should have at a very minimum sent the request for

11 admissions and other discovery requests to you, Mr. Cohen.

12 But I'm looking at the fact pattern here.  And Mr. Silao,

13 he's not just a regular guy, a schlub.  He's a doctor, went

14 to college, went to medical school, a very successful

15 practice.

16          He and his brothers sort of got in trouble for

17 trying to run a business.  Oftentimes lawyers and doctors

18 are not very good businesspeople.  They're good at their

19 profession.

20          But I'm looking at this, and I'm not sure I should

21 give Mr. Silao a complete pass, because the confusion and

22 what happened with Ms. Bereliani is to a great extent the

23 fault of Mr. Silao who tried to -- he and his brothers.

24 Their conduct with lawyers is just not what you should do.

25 You either hire lawyers or you don't.

1      And I always find myself -- I see something like

2  this a lot, and luckily before I became a judge I was at a

3  law firm where we didn't have to take any schlub who walked

4  in the door.  And I would have just told Silao:  "Get out of

5  here.  I'm your attorney or I'm not.  This sort of way of

6  trying to limit my engagement, I could do this but not that,

7  I don't have time for this.  Get out, get out of my office."

8      And Ms. Bereliani is at fault for allowing that to

9  happen.  She should have just told him, "No, I'm not

10 representing you on that basis."  But Mr. Silao himself is

11 partly at fault for creating this situation.

12     So I think they're both culpable for what happened

13 here.  And I feel bad for you, Mr. Cohen.  I think you were

14 just walking down the street and stepped on gum.  You're

15 stuck with this client now.

16     And I see both of them, both the former lawyer and

17 your client are equally responsible for the situation that I

18 have before me.  And I have a hard time trying to apportion

19 that other than 50/50 where both of them are liable so both

20 of them should be jointly held responsible for what happened

21 here.

22     So whatever you want to say in response to Mr.

23 Polis and this issue that I raised, Mr. Cohen.

24     MR. COHEN:  Thank you.

25     Mr. Polis spoke about a smokescreen that I just

1  dropped on the Court.  Well, the smokescreen --

2           MR. POLIS:  Smoking gun.

3           MR. COHEN:  Smoking gun, thank you.

4           Mr. Polis mentioned that he FedEx'd the unilateral

5  pretrial to my client at my client's address.  So what.  He

6  subsequently retained me.

7           There isn't accumulation of evidence of neglect by

8  my client.  I understand the concern the Court has with the

9  other two Silao brothers.  But as far as this motion is

10 concerned, there is only one controlling issue, and that is

11 whether the RFA's should be deemed admitted or not.

12          We've presented evidence that Silao did not

13 receive the RFA's.  He can't divine it.  This is not an act

14 of playing games with the Court if he never received it.

15          All arrows point to Ms. Bereliani.  Either she had

16 it and failed to turn it over or she didn't have it and it

17 got lost in the shuffle or she had it and stood on ceremony

18 and said, "You know what, since I'm not retained I'm not

19 producing it to you."

20          Furthermore, there is no focus on the fact that

21 this discovery never should have been issued in the first

22 place without the initial disclosures.

23          So in terms of apportionment, I don't see any

24 basis by which Mr. Silao, my client, can be judged guilty,

25 so to speak, by the sins of his brothers.  In this case, in

1  this narrow picture, there is no instance where he was

2  playing games with the RFA's.

3          In fact, at the last hearing when we argued it,

4  this Court believed Mr. Silao, said his presence is not

5  required at the hearing.  And his declaration states

6  emphatically -- and as I wrote to Mr. Polis, my client

7  swears over a stack of Bibles he never received it.  The

8  spirit of FRCP 36 is that we punish the person who knows

9  about the deadline, received the pleading and didn't

10 respond.

11         Here we have a situation that the Code was

12 designed to factor in.  If the defendant never received the

13 RFA's, it is simply unfair to punish him.  Plus the

14 nanosecond I was retained, I provided verified responses at

15 the first available opportunity.

16         So to punish the debtor at this stage and have

17 them deemed admitted is unfair.

18         Now, again, the smoking -- what was the term?

19         MR. POLIS:  Smoking gun.

20         MR. COHEN:  The smoking gun that I raised earlier,

21 it could mean that she had it.  Again, as I said earlier,

22 I'm not entirely sure.  But as to apportionment, I would

23 urge the Court to just simply focus on Ms. Bereliani.  I

24 know that there's CCP 473(b) that says that when a lawyer

25 falls on her sword, they can prevent a default from

1  occurring.  I don't know if there's an equivalent in federal

2  practice.

3        But the CCP does say that when a lawyer makes that

4  statement, they have to pay the fees.  I would urge the

5  Court to adopt CCP 473(b), at least the spirit of it, and

6  say:  Based on the above, Ms. Bereliani should be

7  responsible for paying the fees.

8        And if she doesn't, my client should still not be

9  penalized.  It would be an issue, in fact, between the

10 trustee and Ms. Bereliani or the Court and Ms. Bereliani.

11 But my client was the innocent victim here.

12        THE COURT:  Thank you, MR. COHEN.

13        Any last words, Mr. Polis?

14        MR. POLIS:  Just the point that your Honor raised

15 as far as, you're right, we see doctors -- I see doctors all

16 the time, dentists, et cetera.  They think they're the

17 smartest ones in the room, and let's face it, as the Court

18 pointed out, notwithstanding obviously Mr. Cohen jumped in

19 this case whenever that was, in August of '19, things

20 happened.  If Mr. Cohen was in this thing from the get-go,

21 we're not sitting here today.

22        But the point is, this defendant tried to game the

23 system.  And sort of coming around third, thinking he had

24 gamed the system, oops, he didn't game the system.  He

25 basically set up the perfect storm, and this is it.  But,

1 again, as the Court pointed out, he started this by:  You're

2 in, you're out, you're not in.  You know, okay, well, let me

3 not do anything, and oops, this is serious.

4        That's gaming the system.  I would ask the Court

5 to deny the motion.

6        THE COURT:  All right.  Mr. Cohen.

7        MR. COHEN:  I don't know what "gaming the system"

8 means.  The defendant retained Bereliani on a limited

9 retainer to file an answer to avoid default.  That is about

10 the extent of what I see he did wrong, so to speak.

11       But nevertheless, Bereliani's retainer said that

12 she would notify the client of every step of the way.  She

13 didn't.  She actually executed a joint status report without

14 conferring with my client.  She made representations to the

15 Court about mediation and trial length.  She's confused my

16 client regarding the scope of her retention.

17       Lawyer clients get into disputes all the time, but

18 that's not evidence of gaming the system.  Okay?

19       Now, the Court asked about -- which is beyond the

20 scope of this motion -- about who signed the tax return.

21 It's an issue for trial, not an issue for today.

22       And pursuant to the verified responses to the

23 RFA's, we produced voluntarily, without wasting any time,

24 the checks to my client that contained a notation of

25 reimbursement of loan, evidencing that they were repaid --

1 I'm sorry, that the monies that my client received was a

2 reimbursement for the loan that my client advanced to the

3 company. That's an issue for trial. That's not an issue

4 for today.

5 What to do and where do we go from here, I think

6 there still remains an ambiguity as to the Bereliani

7 statement in that exhibit that I brought to the Court's

8 attention. I think the more egregious her malpractice, the

9 more apportionment she should share. If indeed that

10 statement is to be read that she had the RFA's and didn't

11 produce them to my client, no greater evidence can be

12 presented that my client was not gaming the system but was

13 the innocent victim of a negligent attorney.

14 THE COURT: Thank you, Mr. Cohen.

15 All right. So I am going to rule today without

16 testimony from Ms. Bereliani. I'm going to grant the motion

17 in part. I will have the request for admissions deemed

18 withdrawn, but it will be subject to compensating the

19 trustee and the bankruptcy estate for the attorneys' fees

20 and costs incurred by the trustee and trustee's counsel.

21 I don't have full evidence of that, so I'm going

22 to give an opportunity for Mr. Polis to provide billing

23 detail related just to this dispute regarding the request

24 for admissions dispute.

25 I will give all parties, including Ms. Bereliani,

1 an opportunity to object.  I'm inclined to make whatever the

2 final attorney fees and costs be jointly and severally

3 liable between Ms. Bereliani and Mr. Silao.

4 　　　　　I'll give one caveat.  One caveat.  Unless before

5 the hearing -- I'm going to continue the hearing.  And that

6 could just become telephonic, people don't have to come --

7 if Ms. Bereliani actually files a declaration under penalty

8 of perjury saying it is her fault, Mr. Silao bears no

9 responsibility, I might reconsider the apportionment.

10 Rather than they're both jointly and severally liable for

11 the attorney fees, that it might be reapportioned either

12 more to Ms. Bereliani or completely Ms. Bereliani.

13 　　　　　But what I have today, the email that's attached

14 as an exhibit, is not a statement.

15 　　　　　Mr. Cohen, you're right, it is ambiguous.  She

16 sort of says, "I had it but because of my limited scope of

17 engagement, I didn't respond."  It doesn't really fall on

18 the sword.

19 　　　　　So even if I apply the California Code of Civil

20 Procedure here -- it's not applicable here.  I know of no

21 equivalent under the Federal Rules of Bankruptcy Procedure.

22 But even if I were inclined to adopt some -- as an equitable

23 remedy that I'm allowed to do under the Federal Rules of

24 Bankruptcy Procedure, use that as a consideration for who

25 should be responsible for this, I need to see a definitive

1 stip by Ms. Bereliani that she's solely at fault.

2        If not, if she won't give that, both Mr. Silao and

3 Ms. Bereliani are jointly responsible for compensating the

4 bankruptcy estate for the cost of dealing with this

5 discovery dispute.

6        To me, if there is a problem between Mr. Silao and

7 Ms. Bereliani, Mr. Silao should just sue her for

8 malpractice.  If he has to pay for all of this, he should

9 just sue her for malpractice.  That dispute as between Mr.

10 Silao and Ms. Bereliani, that's between them.  They should

11 resolve it, not here, somewhere else.

12        But from the perspective of this case, bankruptcy

13 estate, the estate should be compensated for -- and here,

14 I'm really focusing on Mr. Silao's conduct.  While I am not

15 inclined to let him off the hook unless Ms. Bereliani really

16 falls on the sword and says she's personally responsible, no

17 one else is, she's going to pay this fee, the attorney fees

18 and costs incurred by the estate.

19        As I said, Mr. Silao is not your typical

20 individual being sued.  It is a highly education person,

21 probably top one percent of this country in terms of

22 educational level.  I'm sure he thinks he's smarter than 99

23 percent of Americans.  He sure acted that way when he was in

24 my courtroom in person, all three Silao brothers.  They sort

25 of had this attitude that being in court, being sued and

1 having to deal with lawyers and judges was inconvenience to

2 them, it was beneath them.

3          It sort of -- I see that conduct a lot.  In all

4 the years that I've been a lawyer -- I've represented

5 hospital, medical groups, I have to say a very common

6 attitude by doctors.  They somehow think the entire judicial

7 system, judges and lawyers are contemptible people.  They

8 don't have time for this.  They're saving lives.  They're at

9 hospitals saving lives, and the idea that they have to come

10 to my court in Riverside.

11          The look on the three brothers' faces when they

12 had to be here was just -- I found it a little irksome, that

13 they had this attitude that they had to be bothered to come

14 to court.

15          And I have to say this Silao brother -- putting

16 aside the two brothers who settled -- the conduct here of

17 what happened, he bears a lot of responsibility for this,

18 trying to hire an attorney who frankly in all the years that

19 I've seen Ms. Bereliani in my courtroom, I mean she does

20 consumer debtor work.  I've almost never seen her really do

21 adversary proceedings in litigation.

22          So he wanted to hire a lawyer on the cheap rather

23 than somebody who can actually litigate a defendant.  It's

24 clear to me he did not find the right attorney for this job

25 if he was really going to litigate it.  He tried to limit

1 her representation.

2        At least according to Ms. Bereliani, when she
3 wanted feedback of what more she should do, he was not
4 communicating to her.  I think both of them bear
5 responsibility for that.  I'm letting Mr. Silao off the
6 hook.

7        And why I am not going to -- unless Ms. Bereliani
8 under penalty of perjury says she's solely responsible,
9 she's going to pay the attorneys' fees herself, why I'm not
10 letting him out, long before we got to the point of request
11 for admissions being deemed allowed, there was a court
12 order, there was a discovery cutoff.

13        So for him, the idea that, well, there was a
14 discovery cutoff in -- when was the discovery -- June 20,
15 2019.  The idea that somehow he thought, well, the plaintiff
16 served no discovery, even if he's not a lawyer and he's
17 transitioning from one attorney to the other attorney, if he
18 somehow thought the plaintiff, the bankruptcy trustee and
19 his experienced counsel did not serve discovery at all and
20 let the discovery cutoff deadline pass, I mean that's
21 wishful thinking at best.

22        So I'm looking at the timing of what happened
23 here.  There was a status conference.  Mr. Silao was sort of
24 lackadaisical about preparing for that, did not give clear
25 instructions to Ms. Bereliani about what she needs to do.

1  So she, in her desperation, decided to do more than what she

2  contracted to do for Mr. Silao and had another attorney, Mr.

3  Smith, appear as a special appearance attorney.  And I

4  entered these deadlines.

5          And I'm going to go back to the one legal issue

6  that was raised, the idea that because there was no initial

7  disclosure, discovery should not have been propounded.

8  Well, the rules are clear.  That's generally true unless the

9  Court orders otherwise.

10          I following the status conference entered a

11  scheduling order that established a discovery cutoff

12  deadline, meaning the parties are free to conduct discovery.

13  At no time did Mr. Silao or any of the attorneys say at the

14  status conference, "No discovery.  We have not done our

15  initial disclosure."  In fact, based on what they put in the

16  status report, I said, "I'm proposing these dates, including

17  discovery cutoff.  Anyone have objections?"

18          I read that transcript.  No one had objections.

19  Everyone said yes, the discovery cutoff is a good date.

20          So now there's a court order allowing for

21  discovery.  So that one legal argument that because there

22  was no initial disclosure, discovery should not have

23  happened, the rules are clear.  The court order trumps the

24  Federal Rules of Bankruptcy Procedure Rule 26 position that

25  you can't do discovery unless there's an initial disclosure.

23

1    The court order trumps that, and I entered an

2  order allowing the parties to conduct discovery and

3  established a discovery cutoff.  I asked Mr. Smith point

4  blank, "Do you have any problems with these dates?"  "No,

5  your Honor."  So an order was entered.

6    Mr. Silao, if he wasn't sure who was going to

7  represent him at that status conference, should have been

8  here in person or by phone, once again chose not to be here.

9  So I can't give him a pass either.

10    If you found yourself in a position where you

11 hired an attorney just to file an answer, not to do anything

12 more, then he should have made himself available and come to

13 court.  He wasn't here.  So I'm not giving him a pass for

14 not being here.  So he's responsible for that as well.

15    So I set a discovery cutoff.  That trumps the rule

16 that you can't have discovery until there's an initial

17 disclosure.  Mr. Silao did not participate in that status

18 conference himself, even though -- if he's standing on the

19 position that my retainer agreement with Ms. Bereliani only

20 allowed her to do certain things, then he should have been

21 here.

22    He's a highly educated man.  If he said, "My

23 retainer agreement with her made it clear all you're doing

24 is filing an answer and nothing more," he should have made

25 himself available and come to the status conference himself.

1  He didn't do that.  So I think he's responsible for the mess

2  that's been created so that's going to be my ruling.

3         What I'm going to do is continue this hearing, not

4  as an evidentiary hearing, as a regular hearing.  I'm going

5  to give Mr. Polis an opportunity to submit his billing

6  records, serve it on Mr. Cohen as counsel for Mr. Silao,

7  also serve it on Ms. Bereliani.  I think she

8  should be given an opportunity to object to the fees if she

9  thinks they're not reasonable.

10        We'll have a continued hearing and it would just

11 be to determine the amount.

12        And one other issue is this sort of falling-on-

13 the-sword declaration.  And if I see it, if I find that

14 convincing, I may change my mind about who needs to pay it.

15 But once again, this payment is important.  They're only

16 deemed withdrawn if a payment is made.  So at the next

17 hearing, I'm going to give a deadline by which a check has

18 to be tendered.

19        So how long do you need, Mr. Polis, for you to

20 prepare your billing records and serve it out?

21        MR. POLIS:  Let's say by the 24th of September, so

22 two weeks from tomorrow.

23        THE COURT:  By September 24th, the billing records

24 should be filed and served out.  I will give anybody who

25 wants to file a response or an objection to those fees by

1 October 8th.

2          Does that work for you, Mr. Cohen?

3          MR. COHEN:  Your Honor, can I have the next

4 Friday, October 15th?

5          THE COURT:  That's fine, October 15th.  And we can

6 have a continued hearing on October 28th at --

7          MR. COHEN:  The week of the 28th -- my groaning

8 was because I'm booked the week of October 18th, the week of

9 October 25th, the week of November 1st.

10          My first available date for a hearing would be

11 November 11th.

12          MR. POLIS:  That's a holiday.

13          THE COURT:  That's Veterans Day.

14          MR. COHEN:  We could do Friday, November 12th.

15          THE COURT:  We can be back here November 18th.

16          MR. COHEN:  November 18th is great.

17          THE COURT:  You can call in.  I'll set this matter

18 November 18, 2021.  I'm going to set this at 10:30 a.m.,

19 separate from my regular cattle call motion calendar.

20          So that's sort of my ruling for today.

21          But I do want to take this opportunity since we

22 have both attorneys in the courtroom and Mr. Anderson is

23 here as well.  I've been really surprised why this matter

24 hasn't settled.  That's just my -- Mr. Silao, like I said,

25 is not just your Chapter 7 debtor being sued for

1    non-dischargeability who usually doesn't have money.  I am

2    often aggravated when non-dischargeability trials don't

3    settle and they go to trial.  The vast majority of debtors

4    really don't have money, they're never going to have money.

5    You have a nice judgment and you can frame it.  Are you

6    going to ever collect that from a debtor who already filed

7    for bankruptcy?

8            That's not the case here.  Mr. Silao is a doctor.

9    I don't know how successful he is anymore, but I suspect at

10   the very minimum, he's making good money.  He's not being

11   sued for a heck of a lot of money here.

12           And I get it, he thinks he paid it back.  But I've

13   got to tell you, there is a problem here.  If this was a

14   loan, he needs to pay it back.  If this wasn't a loan or he

15   thinks he paid it back, somewhere along the way, he should

16   have treated this as income.  I suspect he didn't.

17           One way or another, Mr. Silao is going to have a

18   problem.  If he prevails here -- he got paid money from a

19   corporation, his employer, he did not treat it as income,

20   I'm guessing he didn't pay income tax on it.  He treated it

21   as a loan.  If he prevails here somehow and says this wasn't

22   a loan, I -- he should have treated it as income when he got

23   it.  Unless he paid income taxes on it years back, he might

24   have problems with the Internal Revenue Service if he

25   actually prevails.

*Briggs Reporting Company, Inc.*

 1          And it's not that big of a check to settle this.

 2    I think the only reason the two other brothers settled is

 3    because they had to come to court, and I pretty much

 4    embarrassed them.  You're a doctor, you're in Arizona,

 5    you're busy saving lives.  Why are you flying back to

 6    California to litigate --

 7          MR. POLIS:  $12,000.

 8          THE COURT:  -- this?  Yeah.

 9          MR. POLIS:  12,000 bucks, yeah.

10          THE COURT:  I basically told them, this is going

11    to be painful.  You want to go to trial, fine, but you're

12    going to be in my courtroom.  You're going to miss work.

13    You have to fly out here.  You have to stay in a hotel.

14          This doesn't make any sense.  It's a nuisance.

15    But they had this attitude, "I'm busy."

16          "Well, you're going to be missing a lot of work if

17    you're going to go to trial."

18          It sounds like this Silao brother doesn't live in

19    California anymore either.  Does Mr. Silao really want to

20    come to Riverside, California to sit in my courtroom for a

21    trial?

22          I think it's worth some money not to do that.  I

23    don't know what his defenses are.  Maybe he paid it back,

24    maybe this wasn't a loan, who knows.  But I can't imagine

25    paying attorneys' fees, taking time off of work, flying out

1 to California for a trial makes financial sense for Mr.

2 Silao -- or Dr. Silao.

3          It doesn't make any sense.  And only after I like

4 poured this on the two other brothers did they agree to

5 settle.  But I told them, I get it.  You guys started a

6 business.  It went bad.  You probably lost investment.

7 You're mad about what happened to Pandora.  I get all of it.

8          But litigating means you can't move on with your

9 life.  You're still involved in Pandora years after the

10 fact.

11          And I told them:  There's no way you're going to

12 get out of this unless you settle, until you come to my

13 courtroom and spend a day or two in my courtroom going

14 through a trial.  I don't do direct testimony by

15 declaration.  Everybody has to come to court, direct, cross,

16 redirect.  There is no declaration for trial for me.

17          Mr. Anderson, he lives in my courtroom.  He's a

18 bankruptcy trustee.  He doesn't mind coming to trial.

19          But I suspect, Mr. Cohen, your client is not going

20 to be happy to fly out to California to sit in my courtroom

21 to go through a trial.

22          And a lot of attorneys think, oh, all the

23 bankruptcy judges do direct testimony by declaration.  I

24 don't do that.  I very quickly realized -- Meredith Jury,

25 she and I really didn't get along, my former colleague here.

 1 The one thing I agreed with her 100 percent on, direct

 2 testimony by declaration is a waste of time.  A 10-page

 3 declaration draws a 100-page evidentiary objection.

 4        If I let every witness take the stand, maybe

 5 you'll get three objections.  I can go through direct

 6 testimony in a courtroom in a matter of hours.  Having to

 7 deal with direct testimony by declaration and having to deal

 8 with a 100-page evidentiary objection is a waste of my time

 9 because 99 percent of that evidentiary objection is garbage.

10 But I have to rule on them one by one.  I don't do that.

11        Everyone has to come to court, direct, cross,

12 redirect.  And it's amazing how quickly the trial goes when

13 you make everyone come to court.  All of a sudden, the 50

14 things the party had to testify become four things because

15 people realize, "I don't want to sit here all day.  There's

16 only four things that I really need to say."  And it's done.

17        If I make people write a declaration, they want to

18 tell me the story of their life.  I don't care.

19        So Mr. Silao should really think about this,

20 whether he really wants to -- if he's really living in New

21 York, whether he really wants to come out to California and

22 spend a couple days going through trial for $137,000.

23        For a debtor, it's hard for me to say that because

24 that's a lot of money, but I suspect for Dr. Silao, you

25 know, he doesn't -- nobody wants to write a check.  But I

1  think for Dr. Silao, it's not going to make or break him.

2          MR. POLIS:  Your Honor, can I ask a question?

3          THE COURT:  Sure.

4          MR. POLIS:  In light of your Honor's comments, and

5  obviously I'll talk to Mr. Cohen after this hearing, if

6  there's something that's put together, sort of a global

7  resolution, both the fees for the RFA issue and for the

8  underlying claim, we'll let your Honor know --

9          THE COURT:  Right.

10          MR. POLIS:  -- because right now, we're under a

11  briefing schedule.  But if it turns out in the next few

12  days, week or so, we come to sort of an agreement in

13  principle -- and obviously we'll have to notice under 9019.

14  But that can eliminate all the whatever, the hearing on the

15  18th of October, the 24th of September, these various

16  deadlines you've given us?

17          THE COURT:  Yes.  That would be welcome news to

18  me.  Like I said, I never understood why this matter didn't

19  settle.

20          Go ahead, Mr. Cohen.

21          MR. COHEN:  Thank you.  I hate to sound ignorant,

22  not aware that my client is a doctor --

23          THE COURT:  Oh.

24          MR. COHEN:  -- just to say.  He might be a doctor.

25  I know the other brother is a doctor.  I don't know his

1  level of education.  I know a lot of the Court's comments

2  were aimed at his level of sophistication as being a doctor,

3  and I don't know that he's a doctor.

4        Secondly, the October 15, 2021 opposition date,

5  the only wild card is I don't know Ms. Bereliani's schedule.

6  So I just want to throw in the possible flexibility that if

7  she needs additional time, how do we bring that to your --

8  are we stipping to that date, or are we flexible with that

9  opposition date?

10       THE COURT:  I'm sticking to that date because

11  Ms. Bereliani didn't make herself available.  The one person

12  I have no sympathy for here for a lot of reasons is

13  Ms. Bereliani.

14       MR. COHEN:  Okay.

15       THE COURT:  She could be here.  She's not.

16       MR. COHEN:  Third point of clarification, your

17  Honor is saying that because the Court ordered a discovery

18  cutoff, that that trumped FRCP 26 that requires initial

19  disclosures beforehand.

20       My understanding -- correct me if I'm wrong -- is

21  that when your Honor scheduled discovery, it wasn't an

22  exception to FRCP 26.  It's just that when you do discovery,

23  here's the deadlines and, parentheses, make sure you comply

24  with the Federal Rules of Civil Procedure and Rule 26 in the

25  interim.

1          THE COURT:  Yeah, it's my order.  I know what it

2   means.  When I set a discovery deadline, I meant you can

3   conduct discovery.  That's what I meant.

4          MR. COHEN:  I understand.  Okay.  Thank you very

5   much.

6          THE COURT:  And just so the record is clear, Rule

7   26(d)(1) specifically says without initial disclosure, you

8   can't conduct discovery unless authorized by these rules by

9   stipulation or by court order.

10          MR. COHEN:  I've actually looked into that.  And

11  it has been my experience that there are opportunities to do

12  expedited discovery without doing initial disclosures first,

13  if there's an emergency, exigent circumstance.  That was

14  what I understood that clause meant.

15          THE COURT:  I entered an order.  What I meant is,

16  when I set a discovery deadline, you're free to do

17  discovery.

18          And the other thing is, the case law on failure to

19  do initial disclosure, if you look at the cases, the courts

20  are very sympathetic to the party who attempted to do their

21  initial disclosure but the other side didn't.

22          Here, both parties didn't do it.  So it's hard for

23  me to say, since both sides did not conduct initial

24  disclosure, that one side should be sort of paralyzed by the

25  rules when the other side also failed to do it.

1          MR. COHEN:  I understand.

2          THE COURT:  Thank you everyone for being here.

3          MR. COHEN:  Thank you.

4          THE COURT:  This is not the hearing that I thought

5  I was going to have today.  But it is what it is, and

6  hopefully this matters settles.  If not, I'll see everyone

7  back here November 18th at 10:30 a.m.

8          MR. POLIS:  Thank you.

9          THE COURT:  Thank you.

10         MR. COHEN:  Since this is the Jewish New Year,

11 Happy New Year to your Honor.

12         THE COURT:  Happy New Year.

13         MR. COHEN:  Thank you.

14         THE COURT:  All right.  That concludes the Court's

15 10:00 a.m. hearing.  We can go off the record.

16     (Proceedings concluded.)

17

18         I certify that the foregoing is a correct

19 transcript from the electronic sound recording of the

20 proceedings in the above-entitled matter.

21

22 /s/ Holly Steinhauer_____    9-29-21_____
   Transcriber                   Date
23

24

25

*Briggs Reporting Company, Inc.*